## DANNIE LEE WHITMAN *v.* STATE OF MARYLAND

[No. 333, September Term, 1974.]

*Decided April 3, 1975.*

The cause was argued before MORTON, MOYLAN and MOORE, JJ.

*James D. McCarthy, Jr.,* with whom was *Frank R. Weathersbee* on the brief, for appellant.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General* and *Robert D. Horsey, State's Attorney for Somerset County,* on the brief, for appellee.

MOORE, J., delivered the opinion of the Court.

The primary question on this appeal is whether appellant, Dannie Lee Whitman, who had been the subject of an arrest without probable cause, thereafter consented voluntarily to a search of his truck in which was found an illicit cargo of 9,156 cartons of cigarettes, in transit from North Carolina to New York.

The appeal was taken from a judgment of conviction upon a criminal information in the Circuit Court for Somerset County charging appellant with illegally transporting cigarettes without the required Maryland cigarette stamps and with possession of unstamped or improperly stamped cigarettes. After the denial of his motion for suppression of the contraband, the court (Duer, J. presiding without a jury) found appellant guilty of both counts and sentenced him to a fine of $15,000 plus court costs. Concurrent one year prison terms were suspended.

The record discloses that appellant, age 23, was transporting the cigarettes in a red, six-wheel truck, 1974 model, with a long aluminum body, north of the Chesapeake

Bay Bridge Tunnel late on the night of December 11, 1973. Unknown to Mr. Whitman, a police informant was following him. Telephone calls were made by the informant to Corporal Thomas M. Windsor of the Maryland State Police at 11:58 p.m. on December 10 and thereafter at 12:50 and 1:15 a.m. on December 11. Trooper Windsor in turn relayed this information to State troopers on the Eastern Shore of Maryland, alerting them to be on the lookout for the vehicle. Trooper Franklin R. Evans of the Maryland State Police in Worcester County had appellant under surveillance and ultimately stopped him in Somerset County, just north of the Worcester County line at approximately 1:30 a.m. He was joined there by Trooper P. L. Thomas.

Appellant was placed under arrest by Trooper Evans: "I advised him we had reliable information he was hauling untaxed cigarettes and placed him under arrest, and read the *Miranda* warnings to him." The trooper asked appellant's consent to a search of the vehicle and appellant refused. The truck was then driven by Trooper Thomas to the State Roads Barn in Somerset County. Appellant was transported to the Barn in the police cruiser by Trooper Evans. Trooper Milton J. Hall, a criminal investigator for the Maryland State Police was contacted to assist in the investigation and assistant State's Attorney Widdowson of Somerset County was also summoned. Upon the arrival of Trooper Hall at the Barn, it was ascertained that the vehicle was registered to Whitman Furniture Company of Coats, North Carolina, and appellant was advised that he had the right to give permission to open it. As to his response, Trooper Evans testified:

"A.  He kept saying no, so we told him that we were going to open the vehicle and we were going to get a search warrant.

* * *

Q. You told him you were going to get a search warrant?

A. We started the process to obtain a search warrant.

Q. You started the process?

A. Yes.

Q. And what was that?

A. We were in the process of typing it up and getting the Judge — in fact, the Judge did come to the barn.[1] In between time, the defendant gave us permission. The key to the lock was on the key ring of the vehicle. The defendant opened the rear door and we examined the cargo.

Q. The defendant himself did open the truck for you?

A. He unlocked the lock, yes, sir.[2]

Q. Do you know about what time it was that he gave you consent to open up the truck?

A. I would say about an hour later, hour and a half later. I can't swear for sure exactly what time."

Trooper Evans admitted on cross-examination: "I might have said we will go in the truck with or without your consent, so you might as well give it . . . *I advised him what the law was, that we could legally go in there with or without his consent.* I believe that's my wording." (Emphasis added.) According to Trooper Evans, appellant then stated: "You can go ahead and search it." Trooper Evans had requested appellant to unlock his truck on two prior occasions and had been refused.

Trooper Hall, who appears to have had the principal role in the investigation at the State Roads Barn, testified that he also twice requested permission to search the truck and added:

"I started the search warrant and typed a few

---

1. It appears that Trooper Hall was in communication with District Court Judge Lloyd Simpkins who also came to the State Roads Barn but apparently arrived after the consent had been given.

2. Trooper Thomas testified that he himself clipped the seal on the lock but could not state definitely whether he or the appellant turned the key in the lock. Trooper Hall also recalled that Trooper Thomas cut the seal but was uncertain as to who unlocked the padlock.

sentences and advised Mr. Whitman it would be a lot less time consumed if we could receive a consent to search. And at the time, after I typed several sentences, he acknowledged that he would permit us to search the vehicle.

Q. Do you know what time that acknowledgment of his came forth?

A. I believe it was approximately 2:30.

Q. What time was your time of arrival at the barn?

A. Shortly after 2:00. I'm not certain.

THE COURT: Was Mr. Widdowson there —

THE WITNESS: Yes, sir.

THE COURT: — when he gave you consent to search?

THE WITNESS: Mr. Widdowson was himself interrogating the defendant.

BY MR. HORSEY:

Q. You mean the Assistant State's Attorney?

A. Yes, sir."

On cross-examination Trooper Hall stated that appellant gave his consent to the search after the second request and that the consent came after Trooper Hall in effect stated:

"We are getting a search warrant. It would be a lot less time-consuming if you just go ahead and consent.

Q. And he said?

A. Yes, sir."

Taking the stand in support of his motion to suppress, appellant recalled Trooper Evans' stating that the troopers would open the truck whether he consented or not. He described the effect of this statement upon him in the following manner:

"A. Well, I figured if they were going to open it anyway, I might as well.

Q. Did you say that before you signed this?

A. Yes, sir.

Q. Did that have any bearing on the fact that you signed this?

A. Yes, sir.

Q. What bearing?

A. Well, like I just said, if I was already under arrest anyway, they are going to open it anyway so save a little time.

Q. Did you know you didn't have to sign that?

A. Yes, sir.

Q. You did know that?

A. Uh-huh."

The paper to which the appellant affixed his signature was a form entitled "Consent to Search and Seize." It was executed by him on December 11, 1973 at 2:35 a.m. and contained the following paragraphs after describing the vehicle and granting permission to search it:

"I fully understand that I have a constitutional right to refuse to consent to this search and that the items seized may be used against me in a court trial. I further understand that I have a constitutional right to withdraw my consent at any time and require any further search to be executed on the strength of a legal search warrant.

"This consent has been given by me to the above named officer knowingly and voluntarily and absent of threats, promises or inducements of any kind with the full knowledge that I have waived my constitutional right to refuse this consent."

In his denial of the motion to suppress, the trial court made the following ruling from the bench:

"I think he made a voluntary consent. It's true that he was there perhaps an hour. He tells me that the police outside of asking him to consent to open the truck, apparently treated him all right.

"This man was not treated as a hardened criminal. He wasn't handcuffed. He could move around, smoke if he wanted to, and I suspect he did just about as much as any troopers down there.

"He signed this consent and he knew he consented because he thought it would save time. He had a right to consent and he did it. I think it was voluntary.

"On those grounds, I overrule your motion to suppress the evidence."

The court did not advert to the question of the legality *vel non* of appellant's arrest by Trooper Evans. On this point, however, the record is abundantly clear that the familiar requirements of *Aguilar v. Texas*, 378 U. S. 108 (1964) — *i.e.*, the basis of knowledge test and the credibility or reliability test — were not satisfied. Trooper Windsor, to whom the informant made the three telephone calls, could provide no testimony concerning the informant's basis of knowledge and could only testify that he had had two prior calls from the informant some six months before.

In this condition of the record the State *concedes* in its brief that the evidence "does not sufficiently establish the underlying circumstances for the credibility or reliability of the informant so that the lower court could determine that the police had probable cause to believe that the appellant had committed or was committing a felony." The State contends, however, that even if the arrest was illegal it does not follow that the search was unlawful for the reason that a subsequent search does not become unlawful and the evidence obtained thereby inadmissible if the accused voluntarily consented to the search, placing reliance upon *Anderson v. State*, 237 Md. 45, 205 A. 2d 281 (1965) and *Lopata v. State*, 18 Md. App. 451, 307 A. 2d 721 (1973).

The principal question before us with respect to the denial by the lower court of the motion to suppress the evidence is whether appellant's consent to the search of the truck was voluntary. Appellant has also challenged the sufficiency of

the evidence to sustain his conviction of illegal transportation of untaxed cigarettes.

## I

Preliminarily, with respect to the scope of our review, we observe that in the presence of alleged infringements of constitutionally protected rights, we are required to examine the entire record and to make an independent, reflective constitutional judgment on the facts. *Davis v. North Carolina*, 384 U. S. 737, 741 (1966); *Walker v. State*, 12 Md. App. 684, 280 A. 2d 260 (1971). As Judge Moylan stated for this Court in *Walker* (12 Md. App. at 695):

"What we mean, therefore, when we say that we have the obligation to make an independent, reflective constitutional judgment on the facts whenever a claim of a constitutionally-protected right is involved is that, although we give great weight to the findings of the hearing judge as to specific, first-level facts (such as the time that an interrogation began, whether a meal was or was not served, whether a telephone call was requested, etc.) we must make our own independent judgment as to what to make of those facts; we must, in making that independent judgment, resolve for ourselves the ultimate, second-level fact — the existence or non-existence of voluntariness." [3]

Our analysis of the law applicable to the principal question presented here must focus in the first instance upon two leading cases decided by the Supreme Court of the United States: *Bumper v. North Carolina*, 391 U. S. 543 (1968) and *Schneckloth v. Bustamonte*, 412 U. S. 218 (1973).[4]

---

3. We have here no first-level fact findings by the lower court with respect to the psychological impact upon the appellant of being confronted by the three uniformed and armed State troopers and the Assistant State's Attorney, their obvious consensus that a search warrant would issue and the additional circumstance that a judge who had been telephoned from the place of custody was apparently enroute from his home at 2:30 in the morning in order to sign the warrant.

4. For a comprehensive presentation of consent cases, *see* Annotation, "Validity of Consent to Search Given by One in Custody of Officers", 9 A.L.R.3d 858 (1966).

In *Bumper* a black man was brought to trial and convicted upon a charge of rape of a white woman. The conviction was reversed and the case remanded, essentially for the reason that the appellant's grandmother, a 66 year old widow with whom the appellant lived in a house located in a rural area, at the end of an isolated road, was held not to have consented to the search of her residence and that it was constitutional error to admit in evidence a rifle found in the search and allegedly used by the appellant in the perpetration of the crime.

The grandmother, two days after the alleged offense but prior to the petitioner's arrest, admitted four white law enforcement officers into the house. One of the officers had announced, "I have a search warrant to search your house." The woman responded, "Go ahead," and opened the door. At a hearing on the motion to suppress the prosecutor informed the trial court that he did not rely upon a search warrant but upon the consent of the grandmother. (No such warrant was offered in evidence nor was there any return of a warrant in the record).[5] She testified at the hearing that the officer had not read her the search warrant but he did tell her he had one. She believed he had such a warrant and was quite agreeable to the search of her house:

> "... He said he was the law and had a search warrant to search the house, why I thought he could go ahead. I believed he had a search warrant. I took him at his word."

And again she stated:

> "Nobody threatened me with anything. Nobody told me they were going to hurt me if I didn't let them search my house. Nobody told me they would give me any money if I would let them search. *I let them search, and it was all my own free will. Nobody forced me at all.*" (Emphasis added.)

---

5. *See*, Note 15, 391 U. S. 550 where the majority opinion states that no warrant was ever returned and "there is no way of knowing the conditions under which it was issued, or determining whether it was based upon probable cause."

In holding that the petitioner's constitutional rights had been violated, Mr. Justice Stewart, writing for the Court, first stated the rule with respect to the burden of proof where consent is relied upon:

> "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, *he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority.* A search conducted in reliance upon a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid. The result can be no different when it turns out that the State does not even attempt to rely upon the validity of the warrant, or fails to show that there was, in fact, any warrant at all." (Emphasis added.)

As to the effect of a law enforcement officer's claim of authority to search pursuant to a warrant, the Court observed:

> "When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. *The situation is instinct with coercion — albeit colorably lawful coercion. Where there is coercion there cannot be consent.*" (Emphasis added.)

In the instant appeal there was no evidence of a deliberate misrepresentation by the police or by the Assistant State's Attorney that there was a clear right to the issuance of a search warrant. *Bumper* is not, however, to be distinguished simply by stating, as does the appellee in its brief, that the State Police did not claim authority to search the truck under a warrant which in fact did not exist and that they "simply indicated that they would obtain such a warrant if appellant refused consent." This is an understatement of the facts in this case and there remains to be answered the

question whether here was also a situation "instinct with coercion." [6]

Further guidelines in the determination of the voluntariness of a consent to a warrantless search emerged in *Schneckloth v. Bustamonte, supra.*[7] There, a police officer on patrol in the early hours of the morning stopped an automobile in which the petitioner, Robert Bustamonte, was riding, the officer having observed that the vehicle was missing a headlight and a license plate light. Five other occupants as well as the petitioner were requested by the police officer to step out of the car and the driver was given a citation for the missing lights and for driving without a permit. None of the occupants was placed under arrest and none was warned of his constitutional rights. The officer, who asserted at trial that the atmosphere at the time was "congenial," requested and received permission to search the vehicle. Three checks, later ascertained to have been stolen in a burglary, were found under the left rear seat. They were admitted into evidence at the trial over motions to suppress on the ground that there was no consent to the warrantless search of the automobile.

Mr. Justice Stewart, speaking for the majority of the Court, reversed the ruling of the United States Court of Appeals for the Ninth Circuit that it was incumbent on the State to prove that the subject of a search *knew* that he had a right to refuse consent. The Supreme Court thus upheld the ruling of the lower State courts that the question whether a consent to a search was in fact voluntary or was the product of duress or coercion, express or implied, is a

---

6. Distinguishing *Bumper*, the U.S. Court of Appeals for the Fifth Circuit in Hoover v. Beto, 467 F. 2d 516 (1972), held that the search of appellant's home was not constitutionally invalid under Aguilar v. Texas and quoted with approval language of the lower court that, unlike *Bumper* where "the party in question was a 66 year old Negro widow of patently limited education ... petitioner here was himself a lawyer with extensive criminal experience in criminal law and its practical realities. While this is not necessarily a controlling distinction here, it is a circumstance." 467 F. 2d at 522.

7. *Schneckloth* is analyzed critically in 12 Am.Crim.L.Rev. 231-249 (1974); 52 N.C.L.Rev. 644-654 (1974); and 49 Notre Dame Lawyer 891-906 (1974).

question of fact to be determined from the *"totality of all the circumstances."* (Emphasis added.)

The narrow holding of the Court was that when the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments impose upon the prosecution the burden of demonstrating that the consent was *in fact* voluntarily given.[8] With respect to the determination of the element of *voluntariness,* the Court held:

> *"Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent."*[9] (Emphasis added.)

The Court went on to state that consent searches must not be approved without "the most careful scrutiny" by the court in order to assure the absence of coercion:

> "The problem of reconciling the recognized legitimacy of consent searches with the requirement that they be free from any aspect of official coercion cannot be resolved by any infallible touchstone. To approve such searches without the most careful scrutiny would sanction the possibility of official coercion; to place artificial

**8.** In contrast with the instant appeal, the Court observed that "the present case does not require a determination of the proper standard to be applied in assessing the validity of a search authorized solely by an alleged consent that is obtained from a person after he has been placed in custody. We do note, however, that other courts have been particularly sensitive to the heightened possibilities for coercion when the 'consent' to a search was given by a person in custody." (n. 29, 412 U. S. at 241).

**9.** The California State Courts had followed these principles in affirming the respondent's conviction but the Court of Appeals for the 9th Circuit remanded the case for an evidentiary hearing because the prosecution had failed to prove that consent to the search had been made with the understanding that it could be freely withheld.

> restrictions upon such searches would jeopardize their basic validity. . . . In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." 412 U. S. at 229.

Finally, it was also emphasized that the standard of waiver enunciated in *Johnson v. Zerbst*, 304 U. S. 458 (1938) would not be applied to cases involving consent to search. "While we have occasionally referred to a consent search as a 'waiver', we have never used that term to mean an 'intentional relinquishment or abandonment of a known right or privilege.' "

Before we consider other pertinent cases on the precise issue involved in this appeal, we observe that the State's reliance on the cases of *Anderson v. State* and *Lopata v. State, supra,* is misplaced. *Anderson* is not apposite because there was no evidence contrary to the testimony of the police that the consent was freely and voluntarily given, so that the trial court's finding was merely affirmed without any discussion of possible coercion.[10] *Lopata v. State, supra,* although containing a thorough analysis by Judge Moylan of the then recently decided *Schneckloth* case, really involved the consent by an innocent third-party to the search of his commercial garage, where there was no arrest and appellant was found to lack even the standing to contest the search. The issue presented here was not reached.

Predictably, the "totality of the circumstances" rule of *Schneckloth* has since been applied in *custodial* situations as well by all the United States Courts of Appeals confronted

---

10. We accept, of course, the holding of *Anderson* that an illegal arrest does not, without more, vitiate a free and voluntary consent. We note, however, the language of the U. S. Court of Appeals for the District of Columbia Circuit in Judd v. U. S., 190 F. 2d 649 (1951), a case cited in *Schneckloth* as one of those dealing with consents given while in custody:

"This burden on the Government is particularly heavy in cases where the individual is under arrest. Non-resistance to the orders or suggestions of the police is not infrequent in such a situation; true consent, free of fear or pressure, is not so readily to be found."

with the question. *United States v. Garcia,* 496 F. 2d 670 (5th Cir. 1974); *United States v. Rothman,* 492 F. 2d 1260 (9th Cir. 1973); *United States v. Heimforth,* 493 F. 2d 970 (9th Cir. 1974), *cert. denied* 94 S. Ct. 1615; *United States v. Cage,* 494 F. 2d 740 (10th Cir. 1974); *United States v. Campbell,* 16 Cr. L. 2508 (4th Cir. 1975); *United States v. Hearn and Taylor,* 496 F. 2d 236 (6th Cir. 1974); *Hayes v. Cady,* 500 F. 2d 1212 (7th Cir. 1974); *United States v. Watson,* 504 F. 2d 849 (9th Cir. 1974), *cert. granted* February 18, 1975, 420 U. S. 924, 43 L. W. 3452.[11]

That the issue of voluntariness has, since *Schneckloth,* become "a delicate one" was observed by the Tenth Circuit in *United States v. Heimforth, supra,* where the appellant was convicted on four counts of illegally importing marijuana and possession of contraband with intent to distribute. On appeal he contended that the search of his warehouse, revealing large amounts of marijuana, was invalid on the ground that his consent to the search was not voluntary. The evidence disclosed that when he consented to the search he had already been arrested. While holding in accord with *Rothman, supra,* that the Supreme Court's "totality of circumstances" test was applicable to all consent searches irrespective of whether or not the consenting party is in police custody, the Court in *Heimforth* pointed out that in considering the factual issue of voluntariness, *"an important factor, however, remains whether there has been an arrest prior to the consent."* (Emphasis added.) (The case was remanded to the District Court for the limited purpose of making specific findings concerning the legality of the search — that Court having simply made a general determination that the search was legal.)

Applying the guidelines of *Schneckloth,* the Sixth Circuit Court of Appeals in *United States v. Hearn and Taylor, supra,* collated those factors tending to establish a voluntary and uncoerced consent on the part of appellant Taylor to the

---

11. The Court of Appeals reversed the conviction of Watson because it held there was an illegal arrest (made without a warrant), and additionally that his consent to search given while in custody after his arrest was not voluntary.

search of his premises, and also those tending to establish an involuntary and coercive consent search. The record disclosed that local law enforcement officers obtained a State warrant to search Taylor's premises for a stolen Hobart welder. After locating the welder at one building they continued the search, in quest of a stolen traxcavator, going to a barn 150 yards away. One of the police officers testified that they asked Taylor about the traxcavator and he responded that he was unaware that it was in the barn although he had put hay in there some six or eight months before and had not returned to the barn since then. In response to the officer's suggestion that they look at it Taylor responded, "Well, let's go see it." There they found the traxcavator concealed by the hay. After the discovery, Taylor was permitted to go on his way and turned himself in at the jail later on.

The search warrant for the Hobart welder was defective under the standards of *Aguilar v. Texas* and the Court found it clear that the continuation of the search after the location of the welder did not comport with constitutional standards. Consequently the admission of evidence concerning the location of the traxcavator could be supported only upon the theory that Taylor's statements and actions rendered the search a consensual search. The trial court's finding of a valid consent was overruled and Taylor's conviction under the count of the indictment pertaining to the receiving and concealing of the traxcavator was set aside and a new trial granted.

Placed here in juxtaposition, the factors isolated and analyzed by the Court were as follows:

| *Non-coercive* | *Coercive* |
|---|---|
| "(a) his having been initially given his *Miranda* advice of rights incident to | "(a) the presence of three law enforcement officers on his farm; |

| *Non-coercive* | *Coercive* |
|---|---|
| his arrest on the stolen welder charge; | (b) his initial arrest upon the stolen welder charge; |
| (b) his continued freedom of movement and the lack of any physical restraint incident to his arrest upon the stolen welder charge; | (c) the suggestion by the officers that the barn be inspected for the presence of the traxcavator; |
| (c) his presence on his own farm and in familiar surroundings; | (d) the use by the officers of information gained by a prior u n l a w f u l search as the predicate for their suggestion that the barn be inspected for the presence of the traxcavator; and |
| (d) his acquiescence in the officer's suggestion to 'go look at it' (*i.e.*, the traxcavator) and his affirmative response, 'Well, let's go see it'; and | (e) the absence of any warning to the appellant that he had a constitutional right to refuse to consent to a search of the barn." |
| (e) his leading the way to the barn and in mounting the bales of hay in advance of the others." | |

The Court concluded, upon its evaluation of the above elements, that the coercive would substantially outweigh the non-coercive, quoting the following language from *Schneckloth,* as did the Court in *Garcia, supra:*

"In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of *subtly coercive police questions,* as well as the possibly *vulnerable*

*subjective state* of the person who consents." 412 U. S. at 229, 93 S. Ct. at 2049, 36 L.Ed.2d at 864. (Emphasis added.)

Both before and after *Schneckloth,* there are cases in which the primary thrust of appellant's claim of reversible error has been the alleged coercive effect of language or conduct of police officers pertaining to obtaining a warrant. Thus, in *United States v. Curiale,* 414 F. 2d 744 (2d Cir. 1969), *cert. denied* 396 U. S. 959 (1969), where the appellant was convicted of knowingly possessing three million dimes moving in interstate commerce, a federal agent presented the appellant with a consent form for searching his premises. The officer testified that after reading the form, appellant looked at the officer and remarked "If I don't sign this, you are going to get a search warrant." According to the officer, "At that point, I stopped him and said, 'I don't want you to sign on that basis. If you are going to sign it, do it voluntary'. [sic] He just looked and signed it."

The Court of Appeals rejected appellant's contention that there was, as in *Bumper v. North Carolina, supra,* an unjustified search. It was found that appellant's statement concerning the search warrant showed an awareness of his right to resist the search in the absence of a warrant and that although he understood his right he nevertheless chose to relinquish it. As to the effect of the police officer's response, the Court held:

> *"Here Ahearn's response was sufficient to put the Appellant on notice that his consent should not be conditioned on the availability or unavailability of a warrant.* There was no duty to disclose that at that particular moment in a continuing investigation there was insufficient evidence to get a search warrant. In any case, it is clear that Curiale knew what he was doing. Relying upon the fact that the dimes were so well concealed that they would not be found, the appellant hoped to turn suspicion

away from himself by appearing to give the authorities innocent and wholehearted cooperation. His lack of success, by itself, does not affect the voluntariness of his assent." (Emphasis added.)

In reliance upon *Curiale,* in *United States v. Savage,* 459 F. 2d 60 (5th Cir. 1972), the Court in a per curiam opinion held that a written consent was not rendered involuntary by reason of the fact that before signing the form the appellant inquired of the police officer if he could get a search warrant and the officer replied, "Yes, we probably can." The Court stated: "The officer's statement was in response to defendant's inquiry, and it was not a misrepresentation of the facts."

Implied coercion was claimed by the appellant in *United States v. Culp,* 472 F. 2d 459 (8th Cir. 1973), *cert. denied* 93 S. Ct. 2161 (1973), wherein a police officer announced that "[W]e are in the process of getting one [a search warrant]; one of our men is getting one and we'll search it [the premises] whether you like it or not." Although the appellant claimed that he agreed to cooperate as a result of this statement and thereafter produced an attache case and a satchel which contained incriminating evidence, the Court found on the record before it that the real inducement for appellant's cooperation was that the officers "had agreed to be lenient with my wife." The Court noted, however, that if the officer's statement had been the only inducement for appellant's consent, "further analysis would be necessary to determine whether the alleged comment requires a finding of illegal coercion." In a footnote reference on this point, the Court stated:

"Many cases imply that where law enforcement officers indicate only that they will *attempt to obtain* or *are getting* a warrant that such a statement cannot serve to vitiate an otherwise consensual search." (Citing cases including *Savage* and *Curiale, supra.*)

In another federal case prior to *Schneckloth, United*

*States v. Boukater*, 409 F. 2d 537 (5th Cir. 1969), the Court expressed similar concern over the language of the police officer. Appellant had been confronted — but not arrested — by federal agents at the Miami National Airport and was told that he was suspected of carrying counterfeit money. Asked if he would voluntarily consent to the search of his briefcase, appellant stated: "It looks like you got me. You can search my bags." According to one of the agents he gave his verbal approval to the search. After refusing to sign a written waiver, however, the agent said something to him about getting a search warrant. Writing for the Court, Judge Thornberry stated in the opinion that the agent was very emphatic in testifying that he did not pressure appellant by saying that he would get a warrant and make a search even if appellant withheld consent; he merely said he would *attempt* to get a search warrant. (Emphasis added.)

In discussing the implications of the agent's statements about procuring a warrant, the Court observed:

> *"The statement by Rivers about procuring a search warrant is more troublesome and might lead us to a different result if the evidence indicated that Boukater was in custody and that the agent either said or implied that he might as well consent because a warrant could be quickly obtained if he refused."* (Emphasis added.)

Weighing all the circumstances, however, the Court concluded that the consent was voluntary:

> "Since appellant had been advised that he was not under arrest and was free to leave, he would not have been coerced into consenting to an immediate search by the agent's statement that he would attempt to get a warrant. As we say, this factor is troublesome, but we have concluded that it does not taint the search since everything else points toward completely voluntary consent."

The Supreme Court of Oregon in *State v. Douglas*, 488 P. 2d 1366 (1971), in the presence of conflicting trial testimony

concerning police officers' statements with respect to their obtaining a search warrant, held by a divided vote that the appellant's consent to a search was voluntary. The comprehensive opinion for the majority discloses that appellant was visited at his motel near the place of the crime by two police officers shortly after a burglary at a nearby service station but he declined to give them permission to examine his suitcase. The opinion attributes to the officers and the appellant, respectively, various statements with respect to obtaining a search warrant. One officer testified that he told defendant he would "make an effort" to obtain a warrant; the other, however, said that he told the defendant that he would *get* a search warrant. The appellant himself, testifying in support of a motion to suppress, stated that when he was alone with one of the officers, he was informed that "it would be better all the way around if I opened it myself because they could get a search warrant." Appellant also testified that his brother-in-law talked with him in the absence of the police officers and told him that the search warrant was "on its way"; and that upon being so informed by his brother-in-law he emptied the contents of the suitcase. After a discursive analysis and discussion of pre-*Schneckloth* case law and authorities, the majority opinion of the Court concluded that the evidence was sufficient to sustain the findings of fact by the trial court that the consent was voluntary. The Court's comments concerning the distinction between a statement by a police officer that he would *get* a search warrant and a statement that he would *apply* for one, are significant. It is stated: (p. 1375)

"Since the primary issue to be decided is whether the consent was voluntary or was coerced, we doubt whether the ordinary person, when confronted with a request by an officer to consent to a search, would discriminate between the statement that otherwise the officer would *get* a search warrant, as compared with a statement that otherwise he would *apply* for a warrant. If, however, it be considered that such a

distinction has controlling significance, and if it also be considered that the evidence in this case was not sufficiently 'clear and convincing' to establish that the officer told defendant that otherwise he would *apply* for a warrant, rather than *get* a warrant, we nevertheless reach the same result under the facts and circumstances of this case. This is because the defendant in this case testified that what finally 'prompted' him to open the suitcase was what his brother-in-law (not the officers) did and said. Thus, he testified that his brother-in-law 'kept after me to open the suitcase' and told him, when he said he would 'wait for the search warrant,' that 'they have got it.' In addition, this is not a case in which defendant merely gave verbal consent to a search. Instead, defendant deliberately opened his suitcase, dumped out the contents and did so not only once, but twice." (Emphasis in original.)

Two other pre-*Schneckloth* State adjudications concluded with startling finality, and absent any discussion, that statements by police officers that they would obtain a search warrant vitiate a subsequent consent. *State v. Lewis*, 454 P. 2d 360 (N.M. 1969); *Poe v. Oklahoma City*, 483 P. 2d 1190 (Okl. Cr. 1971). In *Lewis*, a police officer testified that appellant made no objection to the search of his car because another police officer was going to get a search warrant for it "anyway". The Court of Appeals of New Mexico held flatly: "His consent does not justify the search since it is no more than acquiescence to a claim of lawful authority," citing *Bumper v. North Carolina, supra*. In *Poe, supra*, the record disclosed that appellant was informed by the police that if he did not consent to the search of his automobile it would be impounded and a search warrant obtained. The Court of Criminal Appeals of Oklahoma refused to uphold the State's contention that the defendant voluntarily consented to the search. In reversing the conviction for possession of marijuana, the Court held: "We are of the

opinion that threatening to impound a vehicle and to obtain a search warrant is coercion. It is a well established rule that a waiver obtained by coercion is unlawful."

In the most recent, reported consent case decided by a United States Court of Appeals, *United States v. Faruolo*, 506 F. 2d 490 (2d Cir. 1974), there is oddly no reference whatever to *Schneckloth*, decided seventeen months earlier. It was contended that the appellant Faruolo "reluctantly" signed a consent form permitting the search of his dwelling following the hijacking of a truckload of women's dresses and wearing apparel. Specifically, it was argued that he signed the document because of an apprehension that the federal agents would arrest his 17 year old son whom they had observed unloading the contraband and also because of an alleged representation by a federal agent that he could get a search warrant. Without referring to *Schneckloth*, Mulligan, J., stated for the Court that: "We adhere to the view reaffirmed in *United States v. Mapp*, 476 F. 2d 67, 78 (2d Cir. 1973) that we must look to the 'totality of the circumstances' in determining whether a consent to a search is voluntary or not."

Stating narrowly the question before it, the Court observed:

> "The argument is reduced therefore to the proposition that [federal agent] Egan's statement that he would apply for a warrant, which conveyed the impression that one would be obtained, constituted a coercive factor negating consent. In comparable cases this and other courts have held to the contrary. Here the defendant had been given partial *Miranda* warnings, he was told that he did not have to consent to the search (in United States v. Mapp, supra, 476 F.2d at 77, we held that failure even to advise the person of the right to withhold consent is not fatal but only one factor to be held in the balance) and he consented after being made aware of the fact that a warrant would be obtained."

It is apparent, however, that the Court weighed heavily the District Court's finding that the federal agent's advice was *"well grounded."* (Emphasis added.) In its opinion the Court, indeed, states, "There was no deceit or trickery. The court below found that there was not only a sufficient basis for his communicated belief but that *in fact there were grounds for the issuance of a search warrant. This is not at all open to serious question."* (Emphasis added.) The Court then concluded:

> "In our view, in light of these cases, the *well founded advice* of a law enforcement agent that, absent a consent to search, a warrant can be obtained does not constitute coercion." (Emphasis added.)

In a well-considered concurring opinion in *Faruolo,* Judge Newman, District Judge, focused on the implications to a defendant of a police officer's statement that he would get a search warrant:

> "Were the slate clean, I would be inclined to reject a finding of voluntariness obtained in response to statements about the obtaining of a warrant that did not in some way affirmatively communicate the discretionary aspect of the warrant-issuing process. If a person is confronted with only the choice of permitting an immediate search without a warrant or waiting the brief interval necessary for a warrant to be obtained, he is misled into believing that the only variable in the choice is time, rather than the far more important variable of whether the warrant will be issued at all. If he consents because he has been led to believe that obtaining a warrant is a virtually automatic formality, then regardless of his apparent willingness to permit the search, he has responded to a situation as 'instinct with coercion' as the one in *Bumper,* where the officer gained entry not with the assurance that a warrant could be obtained, but with the statement that he had already obtained one."

The precise impact of *Schneckloth* in terms of its treatment of "psychological coercion" is perceptively analyzed by the United States Court of Appeals for the Ninth Circuit (Duniway, J.) in the case of *United States v. Rothman*, 492 F. 2d 1260 (Nov. 27, 1973). Mr. Rothman was observed by the ticket agent at the Western Airlines counter at San Diego Airport because he appeared to fit the Federal Aviation Administration's profile of potential airplane hijackers. Although he passed through the magnetometer at the boarding gate without activating it, he was nonetheless detained for questioning by a Deputy United States Marshal who had been told by the ticket agent that Rothman met the profile.

Uncooperative, Rothman refused to produce identification and also assaulted the Deputy Marshal as the latter was unlocking the door to his office. He was subsequently arrested for assaulting a federal officer, handcuffed and given *Miranda* warnings. Thereafter his luggage from the plane was brought to the office in which he was being held. He refused permission to search it. Later, his handcuffs were removed and he was handcuffed again with his hands in front of him. The opinion of the Court quotes the following conversation which then occurred:

> "Rothman: 'Why don't you go ahead and open the bags?'
>
> Deputy: 'No, if you refuse to open them I don't want to open them now.' [Something was then said about a search warrant.] 'We can get one and probably will later on.'
>
> Rothman: 'What is the use of going through all this, go ahead and open the bags, it is okay.'
>
> Deputy: 'No, I don't want to open them now. I won't do it. Why don't you open it now? The keys are laying here on the desk, if you want to open it go ahead.'
>
> Rothman took the keys which had been placed in front of him and opened his luggage which contained thirty-nine kilos of marijuana."

Prior to reaching its conclusion that the trial judge's finding of consent was erroneous, the Court adverted to the language of *Schneckloth* concerning the balancing of interests in the ascertainment of the voluntariness of a consent:

> " 'Two competing concerns must be accommodated in determining the meaning of a 'voluntary' consent — the legitimate need for such searches and the equally important requirement of assuring the absence of coercion.' *Id.* at 227, 93 S.Ct. at 2048. Warrantless consent searches are permissible because they enable the police to investigate in situations where the 'stigma and embarrassment' of arrest or a 'far more extensive search pursuant to a warrant' may be avoided. *Id.* at 228, 93 S.Ct. at 2048. 'Consent searches are part of the standard investigatory techniques of law enforcement agencies. They normally occur on the highway or in a person's home or office, and under informal and unstructured conditions.' *Id.* at 231-232, 93 S.Ct. at 2050. The consent search as a tool of police investigation is viewed by the Court as a supplementary aid to routine informal investigatory work which 'normally occur in a person's own familiar territory.' " *Id.* at 247, 93 S.Ct. at 2058.

It was thereafter observed, however, that upon the facts presented in *Rothman,* the "competing concern" of the policy favoring the "legitimate need" for warrantless searches was less significant than under "normal" consent search conditions. The Court stated:

> "Here, Rothman was arrested and handcuffed and had been in incommunicado custody for some time when he opened the bags. He was by no means in an informal atmosphere or on familiar grounds. Rather, he was arrested, handcuffed, isolated in a strange place, given a formal *Miranda* warning and then interrogated by three officers over a period of

approximately two hours. *Such an environment is akin to 'the specter of incommunicado police interrogation in some remote station house' and is squarely 'inapposite' to the questioning environment contemplated when consent searches were held permissible. Id.* at 247, 93 S.Ct. 2041. In a situation such as this the government's burden to prove voluntary consent is increased. United States v. Page, *supra,* 303 F.2d 81, 84; Judd v. United States, 1951, 89 U.S.App.D.C. 63, 190 F.2d 649, 651." (Emphasis added.)

Moreover, the Court rejected the holding of the trial court that since Rothman was aware of his right to refuse consent, his consent was therefore voluntary. Judge Duniway stated that the holding of *Schneckloth* — that knowledge of the right to refuse is but one factor to be taken into account — "cuts both ways. The knowledge of the right to refuse consent is no longer a necessary condition for valid consent, but neither is it a sufficient condition. It is only an element to be considered as part of the 'totality of circumstances'. What is required is a 'careful sifting of the unique facts and circumstances of each case.' *Schneckloth v. Bustamonte, supra,* 412 U. S. at 233, 93 S. Ct. at 2050."

Finally, the Court concluded that under the totality of the circumstances test the psychological atmosphere was of crucial significance. It was observed:

"*The psychological atmosphere in which the consent is obtained is a critical factor in the determination of voluntariness.* Channel v. United States, 9 Cir., 1960, 285 F.2d 217, 220; Judd v. United States, *supra,* 190 F.2d 649, 651. In looking at the factual issue of voluntariness, the court must be aware of the 'vulnerable subjective state' of the defendant as well as the possibility of 'subtly coercive police questions.' Schneckloth v. Bustamonte, *supra,* 412 U.S. at 229, 93 S.Ct. at 2049, and the inherently coercive nature of custodial interrogation, *Id.* at 247, 93 S.Ct. 2041.

"This case is another instance of a custodial investigation in which, 'viewing the totality of the circumstances,' we are compelled to hold that the consent was not voluntary because it was *systematically psychologically coerced.*" (Emphasis added.)

We must conclude, as did the Court in *Rothman*, that the psychological atmosphere in the instant appeal was critically suggestive. Appellant, age 23, had a tenth-grade education. His principal most recent work experience had been service in the United States Army.[12] He had no prior criminal involvement. To be sure, he had been administered *Miranda* warnings out on the highway immediately upon his arrest; and he was treated with civility in custody, as the trial court found. He was not handcuffed nor denied the opportunity to smoke nor did he complain of being deprived of food or drink or physical comforts.

It is manifest, however, that the testimony below presented other facts and circumstances of enormous psychological effect and of compelling significance:

1) There was no probable cause for appellant's arrest, as shown by the evidence and as conceded by the State;

2) He was in custody for at least one and a half hours in the presence of three uniformed State troopers and a prosecuting attorney;

3) He was detained in a strange environment, a room located in the State Roads Barn to which he and his truck had been separately transported;

4) He was subjected to questioning by at least two uniformed State troopers and by the prosecuting attorney;

5) In his presence, telephone calls were made after two o'clock in the morning to a local District

---

12. He had served in Vietnam and had recently been honorably discharged and married.

Court judge and the circumstances were such as reasonably to induce appellant's belief that the judge was enroute to issue a search warrant;

6) The search warrant papers were being typed in his presence after refusals on his part of several requests to consent to the search of his truck and appellant was told by the officer at the typewriter that less time would be consumed if he consented to the search;

7) The State police had previously "advised him what the law was" and had stated unequivocally that they could legally conduct the search with or without appellant's consent;

8) Appellant's ultimate oral and written consents were given after about one and a half hours in custody, at approximately 2:30 a.m., as he expressed it, and as the trial judge found, to save time. ". . . if I was already under arrest anyway, they are going to open it anyway so save a little time."

The Supreme Court of Oregon observed in *State v. Douglas, supra,* that the "subject of illegal searches and seizures is one of the most confused and difficult subjects of the law today" and noted also that the variety of views expressed on the subject of consent searches seems to defy reconciliation. Without taking issue with the views thus expressed, we think the clear teaching of *Bumper,* later expressly enunciated in *Schneckloth* and its progeny, including *Rothman, supra,* (and patently the rationale of *Miranda*) is that the will of the individual in custody may be overborne by less than physical force or threats, or an atmosphere charged with hostility, duress or violence. The lesson articulated by *Bumper* and *Schneckloth* in the area of search consents is that the individual subjected to the search may indeed be *submitting* rather than *consenting,* even in an atmosphere of relative cordiality because of the presence of psychological forces as potent and effectual in achieving a

"consent" as the traditional techniques and familiar instruments of physical "persuasion." We must, we find, be guided by the holding in *Bumper* that a consent which is actually simple acquiescence to lawful authority is not voluntary and, when the defendant is in custody, by the concern expressed in *Schneckloth* that "in examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents."

While each case must rest for decision upon its own facts and the "totality of the circumstances," an arrest without probable cause followed by custodial prodding for the arrestee's consent to a search, combined with police representations that the issuance of a warrant will be practically automatic — these are circumstances calculated only to persuade the individual that insistence upon Fourth Amendment guarantees will secure for him merely a delay of the inevitable search rather than the protection against unreasonable search and seizure to which he is constitutionally entitled. Such a melange of fact and circumstance as was here presented is, we think, inherently coercive.[13]

The final capitulation of the appellant was the inevitable consequence of his "vulnerable subjective state" and the "subtly coercive" statements and conduct of his captors. In the totality of the circumstances above enumerated, his consent was lacking in voluntariness. It was error to deny the motion to suppress.

## II

In the light of our determination that the contraband should have been suppressed, we find it unnecessary to consider the alternative claim that the evidence was insufficient to show a violation of Article 81, § 455 of the Annotated Code of Maryland prohibiting transportation of

---

**13.** It seems probable that cases discussed *supra*, holding that the consents were voluntary, *e.g.*, Boukater, Douglas and Faruolo, would have reached contrary results given the circumstances here noted.

unstamped cigarettes without the required shipping documents.

Additional probative evidence with respect to the legality of the search may be available to the State. Therefore, we shall remand for a new trial. Upon remand, the State will bear the burden of demonstrating to the satisfaction of the lower court that it can produce additional probative evidence. Such evidence shall be presented within such time as may be authorized by the lower court. If the lower court is satisfied with the presentation by the State, it shall hold a new trial; if not, it shall enter a judgment of acquittal. See *Gray v. State,* 254 Md. 385, 255 A. 2d 5 (1969); *Smith v. State,* 8 Md. App. 163, 258 A. 2d 755 (1969).

> *Judgments reversed; case remanded for a new trial; costs to be paid by Somerset County.*