# ELLWOOD LEUSCHNER *v.* STATE OF MARYLAND

[No. 618, September Term, 1978.]

*Decided February 8, 1979.*

The cause was argued before GILBERT, C. J., and LISS and COUCH, JJ.

*Gilbert H. Robinette, Assigned Public Defender,* for appellant.

*F. Ford Loker, Assistant Attorney General,* with whom were *Francis Bill Burch, Attorney General,* and *Richard D. Warren, State's Attorney for Wicomico County,* on the brief, for appellee.

COUCH, J., delivered the opinion of the Court.

Ellwood Leuschner, the appellant, was charged with murder, sodomy, and related offenses in Wicomico County, Maryland. Trial was held in the Circuit Court for Garrett County before a jury, upon the request of appellant, which resulted in a finding of guilt of felony murder. Subsequently, appellant was sentenced to life imprisonment. From this conviction appellant appeals, presenting the following issues:

"1. Whether the trial court erred in admitting Appellant's clothing and boots into evidence?

2. Whether the trial court erred in admitting Appellant's hair samples into evidence?

3. Whether the trial court erred in admitting the knife recovered from Betty Larmore's automobile into evidence?

4. Whether the trial court erred in admitting Appellant's statement to Sergeant Leard into evidence?

5. Whether the trial court erred in allowing Dr. Fitzpatrick to testify as to the result of the hospital medical staff conference which he did not attend?"

Because of the nature of the issues raised, we shall only briefly set forth the facts giving rise to the charges against appellant. On October 29, 1977, a nine year old boy, Rusty Marine, Jr., disappeared from his residence in the Naylor Mill Mobile Village in Salisbury, Maryland. He was last seen with appellant, who lived in a trailer next door to the boy's residence with a Betty Larmore. On October 31, 1977, the boy's body was found in a shallow grave. The cause of death was described as multiple stab wounds to the back. The ensuing police investigation into the initial disappearance and subsequent discovery of the Marine boy's body ultimately led to appellant's arrest.[1] Further facts will be supplied as necessary.

## 1—4

### The Motions to Suppress

Appellant's issues 1—4, inclusive, all deal with the denial by the trial court of his motions to suppress certain pieces of evidence and his statement. We shall address each issue sequentially.

## 1

### The boots

On October 30, 1977, police officers went to the trailer where appellant and Betty Larmore lived. Appellant had been taken into custody prior to this because of information being received that appellant was wanted in California for a parole violation. It seems that both appellant and Larmore owned the trailer. During this visit the police asked Larmore if they could conduct a search of the trailer, advising her that she did not have to let them and that they could apply for a search warrant. She indicated she understood her rights and signed a consent form. Thereafter, Larmore gave the police some pants and a shirt belonging to appellant and, with her consent,

---

1. Appellant was also charged with the murder of Troy Krause but that case was severed from the instant case at appellant's request.

they took a pair of his boots. Appellant argues that the court should have suppressed the clothing and boots because (1) there was no valid consent, and (2) there was no right to seize these items even assuming a valid consent. We disagree.

Appellant concedes that Larmore could give a valid consent to search those areas of the trailer held under common authority with appellant since they possessed common authority over the trailer generally. *See Tate v. State,* 32 Md. App. 613, 363 A. 2d 622, *cert. den.,* 278 Md. 723 (1968). He claims that any consent given by Larmore was not voluntary, citing *Whitman v. State,* 25 Md. App. 428, 336 A. 2d 515 (1975). We think his reliance on *Whitman* is misplaced. In that case, it is clear that the consent was given only after a truck operator, suspected of transporting an illicit cargo of cigarettes, was told they (the police) were going to get a search warrant and that they could legally go in there with or without his consent. Beyond this, there was evidence that Whitman had been arrested initially without probable cause, followed by custodial prodding for his consent to a search and police representations that the issuance of a warrant would be practically automatic. We concluded in that case that under the totality of the facts the consent was coerced and thus not voluntary. In the present case we are persuaded otherwise. Larmore was not under arrest or even a suspect. She was not misled or cajoled, threatened, or interrogated at length, nor was she told they could search the trailer with or without her consent. There is no question but that she was told her rights and understood them. Furthermore, it appears that she actually gave the clothing to the police.

With respect to appellant's second reason why the trial court erred, we likewise find no merit. Appellant argues that since the police did not have sufficient probable cause to obtain a search and seizure warrant, they could not legally seize his clothing and boots. This argument overlooks the fact that consent had been given. In *Wiebking v. State,* 19 Md. App. 226, 310 A. 2d 577 (1973), we held that a warrantless search, even without probable cause, is not constitutionally proscribed when there has been a valid consent to the intrusion. In *Frazier v. Cupp,* 394 U. S. 731, 89 S. Ct. 1420,

22 L.Ed.2d 684 (1969), the Supreme Court, in dealing with a similar question, stated:

"Petitioner's final contention can be dismissed rather quickly. He argues that the trial judge erred in permitting some clothing seized from petitioner's duffel bag to be introduced into evidence. This duffel bag was being used jointly by petitioner and his cousin Rawls and it had been left in Rawls' home. The police, while arresting Rawls, asked him if they could have his clothing. They were directed to the duffel bag and both Rawls and his mother consented to its search. During this search, the officers came upon petitioner's clothing and it was seized as well. Since Rawls was a joint user of the bag, he clearly had authority to consent to its search. The officers therefore found evidence against petitioner while in the course of an otherwise lawful search. Under this Court's past decisions, they were clearly permitted to seize it. *Harris v. United States,* 390 U. S. 234 (1968); *Warden v. Hayden,* 387 U. S. 294 (1967). Petitioner argues that Rawls only had actual permission to use one compartment of the bag and that he had no authority to consent to a search of the other compartments. We will not, however, engage in such metaphysical subtleties in judging the efficacy of Rawls' consent. Petitioner, in allowing Rawls to use the bag and in leaving it in his house, must be taken to have assumed the risk that Rawls would allow someone else to look inside. We find no valid search and seizure claim in this case." *Id.* at 740.

*See also Cleveland v. State,* 8 Md. App. 204, 259 A. 2d 73, *cert. den.,* 257 Md. 732 (1970), and *Miller v. Warden,* 16 Md. App. 614, 299 A. 2d 862 (1973). We see no error in denying appellant's motion to suppress the clothing and boots.

## 2

### *The hair samples*

Appellant next argues that the trial court erred in not suppressing certain hair samples the police had obtained from him on November 1, 1977, since such samples were the "fruit of the poisonous tree". *Wong Sun v. United States,* 371 U. S. 471, 83 S. Ct. 407, 9 L.Ed.2d 441 (1963); *Everhart v. State,* 274 Md. 459, 337 A. 2d 100 (1975). He contends that the samples were not obtained until after the State had obtained an inculpatory statement from him in violation of his privilege against self-incrimination and right to the assistance of counsel. Assuming, without deciding, that the samples were obtained following an invalid confession, we do not find that the trial court erred in denying appellant's motion to suppress, under the circumstances present here. In *Baker v. State,* 39 Md. App. 133, 383 A. 2d 698 (1978), a case in which we dealt in part with the "fruit of the poisonous tree" doctrine, we stated:

> "The *Wong Sun* Court went further and stated:
> 'We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." ' (Citation omitted.) *Id.* at 140.

The three generally recognized exceptions to the application of the doctrine are: 1) where the evidence sought to be introduced has an independent source, or 2) the evidence would inevitably have been discovered, or 3) where "the connection between the lawless conduct of the police and the

discovery of the challenged evidence has become so attentuated as to dissipate the taint". 39 Md. App. at 140.

In the present case we conclude that circumstances warrant the application of the exception that the evidence would inevitably have been discovered. At the time the hair samples were requested of appellant (and we note he voluntarily obtained them himself and gave them to the police), the police were in possession of evidence from the grave site, appellant's trailer, information as to his having been seen last with the victim, and of his movements which would have led police to him anyway. Once in custody, it is clear that the police would have been justified in obtaining the hair samples, even without appellant's consent. *See Chimel v. California,* 395 U. S. 752, 89 S. Ct. 2034, 23 L.Ed.2d 685 (1969) and *Robinson v. State,* 18 Md. App. 678, 308 A. 2d 734, *cert. den.,* 269 Md. 765 (1973). We find no error on this issue.

### 3

### *The knife*

Appellant argues further that the trial court erred in not suppressing a knife found on a second search of Larmore's automobile since it was discovered after an invalid inculpatory statement. We find no merit in this contention. Again, we need not decide if appellant's statement was invalid, triggering the "fruit of the poisonous tree" doctrine, simply because the search was obviously done with the consent of the sole owner of the automobile. In our view, appellant had no standing to object. *See Rakas v. Illinois,* U. S., 99 S. Ct. 421, 47 L. W. 4025, 4026, n. 1 (1978).

### 4

### *Testimony of undercover police witness*

During the early stage of appellant's incarceration in the Wicomico County Jail, and apparently after he had given the inculpatory statement, he made some statements to an undercover State police officer, who had been placed in

appellant's cell under a ruse. The trooper was supposed to have been held on an escape and murder charge from Ohio. The trooper gave uncontradicted testimony that he did not interrogate appellant during the time they were together, but there was an exchange of accounts of crimes each had been charged with in the past. Pertinent portions of the trooper's testimony are as follows:

"A Leuschner and I discussed the fact that I was escaped and had a fugitive warrant on me from Ohio, and he talked about a fugitive warrant from California, and for about an hour, during breakfast, he discussed that fugitive warrant from California and said that he didn't know what it was about, and that he had thought the warrant had been dropped months before as his running partner, as he put it, had been tried for the crime.

Q Did you ask him any questions at that time concerning the episode under investigation in Wicomico County?

A No sir, I did not.

Q . . . After your conversation at breakfast, what if anything did Mr. Leuschner do?

A Mr. Leuschner then starting [sic] talking about the murders of the boys in Wicomico County.

Q What did he say?

A Just discussed them as third party, in general, at that time.

Q What do you mean by that?

A He was talking — he said, they're trying to put a couple murders on me.

Q Did you ask him any questions?

A No sir, I did not.

\* \* \*

Q All right. What if anything occurred . . . in the cell that evening?

A We had supper, Leuschner and I, and he started

talking about the conversation of past crimes in California and about murder in general and during the conversation, he would slip in the conversation about the homicides of the young boys in Salisbury area.

Q Did he give you any specifics as to the — what had happened to the boys in the Salisbury?

A Not at that time, no sir.

Q Did there come a time later on in the evening when he did?

A Yes sir.

Q Did you ask him any questions about what had happened to the boys?

A No sir.

Q What exactly did he tell you?

A When he started talking about the homicides in the Salisbury area, he indicated to me that the police were trying to link him up with any unsolved homicides on the east coast involving young boys. He said to me, the cops are trying to link me to any murder of any young boys in the past two or three years. He said, but they always do things like that, and he said at one point, they're trying to get me for a Virginia murder and I haven't even been in Virginia for twenty or eighteen years. He was very explicit about that, that he was not involved in the murder of a young boy in Virginia. He never indicated to me during any of the conversations that either homicide was sexually related.

Q Did he indicate how the boys had been killed?

A Yes, he stated the Marine boy had been stabbed because he had learned how to kill with a knife in Korea and was taught by the Army to do so. Further at one point, he told me when he was in Korea, he had learned to garrote. When he said he learned to garrote, he made his hands in a form of a choking garrote.

Q Did he say anything specifically as to what

432

relevance that had to the crimes that were under investigation?

A At the time he was talking about stabbing, that he had stabbed — that one boy had been stabbed, he said, the other one, I learned to garrote too when I was in Korea. The army taught me how to do that.

Q Did he specifically say that he had done that to one of the boys?

A No, he didn't.

Q Did you attempt to get him to clarify that in any manner? Did you ask him any questions about it?

A No, he talked about — when talking about the stabbing, he would say, not a point of fact that I stabbed him, he would say that boy was stabbed and then he said, the other one was choked, because I learned to garrote, but he didn't say that I did the choking or the stabbing.

Q Did you make any effort to get him to say that?

A No, I did not.

Q Did you ask him any questions about what he was telling you?

A No. I would just say that I didn't believe it, or something like that, and he would go further into the incident. He, at one time, indicated to me that he was scared of what the police would find, because they might get him for four or five, indicating four or five separate murders, and indicated to me during conversation that both boys were buried in close proximity, being the same area.

Q Did you make any effort to get him to reveal any of this information to you or steer the conversation towards that subject?

A No sir.

Q You did talk yourself to him?

A I did. I talked about crimes that I had supposedly done and talked about doing some armed robberies, something like that, and then he would

talk about his crimes, not just these crimes, other crimes."

Appellant urges that the trooper's testimony should have been excluded because it amounted to a custodial interrogation and required the *Miranda* warnings,[2] which were not given. We disagree. He concedes that volunteered statements are not within the ambit of *Miranda,* and that deceit may be used by the police in obtaining a confession. *See Hopkins v. State,* 19 Md. App. 414, 311 A. 2d 483 (1973), *cert. den.,* 271 Md. 738 (1974). Appellant argues the error here is simply that he was in custody and interrogated in violation of *Miranda.* Although there is no doubt appellant was in custody, his statements were not made in response to interrogation. *See Vines v. State,* 40 Md. App. 658, 394 A. 2d 809 (1978); *Howell v. State,* 5 Md. App. 337, 247 A. 2d 291 (1968), *cert. den.,* 253 Md. 734, *cert. den.,* 396 U. S. 907. The holding of *Miranda* makes it explicit that interrogation is a critical element in determining whether appellant's statements were compelled:

> ". . . the prosecution may not use statements, whether exculpatory or inculpatory, *stemming* from *custodial interrogation* of defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody* or otherwise deprived of his freedom of action in any significant way." (Emphasis supplied). 384 U. S. at 444.

This Court in *Cummings v. State,* 27 Md. App. 361, 341 A. 2d 294, *cert. den.,* 276 Md. 740 (1975), observed that there are two threshold inquiries which determine *Miranda's* applicability: (1) was there custody; and (2) was there interrogation? *Id.* at 367. This second question must be answered in the negative. The appellant's statements were made in "general

---

2. Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966).

conversation"; they were not given in response to questioning. *See Bazzell v. State,* 6 Md. App. 194, 199, 250 A. 2d 674 (1969). In *Howell v. State, supra,* a case somewhat analogous to this situation insofar as no questions were asked by police, this Court held that incriminating statements made after the reading of a codefendant's confession implicating the defendant were not made in response to "interrogation" within the meaning of *Miranda. See also Cummings v. State, supra* at 385. In *Hoffa v. U.S.,* 385 U. S. 293, 304, 87 S. Ct. 408, 17 L.Ed.2d 374 (1966), the Supreme Court held that incriminating statements made in conversation with and in the presence of a government informer were wholly voluntary and that the element of compulsion required by the Fifth Amendment was absent. *Miranda* itself said the following with reference to voluntary statements:

> "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." 384 U. S. at 478.

In light of the precedents and upon our independent review of the record, we cannot dispute the trial court's ruling on the suppression motion, which we quote, in pertinent part, below:

> "[The trooper] . . . did not initiate conversation relative to the crime in question. His testimony was that he conducted no interrogation, no questioning about the crimes about which he was attempting to find information, and in fact the only information that he was able to elicit was that the defendant knew where the bodies were buried. There is some further testimony about the defendant knowing how to kill in two different fashions but for what it's worth, I find that it is voluntary and admissible, by the same preponderance of the evidence test."

5

### Dr. Fitzpatrick's testimony

Appellant's final contention is that Dr. Fitzpatrick should not have been allowed to testify as to the results of a staff conference at Clifton T. Perkins State Hospital which he did not attend. Dr. Fitzpatrick, a psychiatrist, had personally seen and examined appellant, who had been referred to the hospital by the Circuit Court for Wicomico County for a psychiatric evaluation following his filing a plea of insanity. During his direct examination the doctor was allowed to refer to the hospital record, which had previously been shown to have the qualities of a business record. As part of the record there was a filled-out form, referring to a staff conference, which reached a conclusion that while appellant did suffer a mental disorder he was competent to stand trial and the disorder did not prevent him from appreciating the criminality of his conduct or conforming his conduct to the requirements of the law.[3] It is not entirely clear from the record whether an objection was properly preserved. Nevertheless, we find no error in allowing the doctor to read the results of the staff conference since he only read the diagnosis and not any opinion as to the ultimate issue, legal sanity or not. Appellant equates the instant case with *Gregory v. State,* 40 Md. App. 297, 391 A. 2d 437 (1978), wherein we reversed a conviction for false imprisonment and assault because we held the trial court had erred in admitting into evidence parts of psychiatric reports which recorded opinions as to the accused's criminal responsibility; we did so because we found this violated the accused's right to confront witnesses against him. We note that in *Gregory* there not only was an objection, constitutionally based, made to the full hospital record from Clifton T. Perkins, which was overruled, but that on cross examination of Dr. Adamo, a defense witness, he was allowed, over objection, to testify that other psychiatrists at the staff conference did not agree with his opinion that the

---

3. Anno. Code of Maryland, Art. 59, § 25 (1972 Repl. Vol.).

accused was not responsible. He was not asked, however, what the opinions were of the other psychiatrists.

In the instant case the trial court sustained an objection to the admission of the Perkins' report. The objection was specifically based on the fact that the report contained a police report, reference to reports of psychiatric evaluation from several hospitals in California, and many references to the fact that appellant was charged with the murders of two boys. Nevertheless, the trial court later allowed Dr. Fitzpatrick to refer to the hospital record and ultimately to read the staff diagnosis over objection. Our reading of the record persuades us that there was no error here. There was no reason given for this objection nor was any reason requested. While it is true that under Maryland Rule 522 d it is not necessary to state the grounds for an objection to evidence unless requested by the court, if, however, grounds are asked for or volunteered, that party will be limited on appeal to a review of those grounds and will be deemed to have waived any ground not stated. *Von Lusch v. State,* 279 Md. 255, 368 A. 2d 468 (1977). Thus it appears that appellant, under the circumstances present, may raise the confrontation ground on appeal. This is of little help to him, however, since we conclude he has waived this right in another respect. In *Peisner v. State,* 236 Md. 137, 202 A. 2d 585 (1964), *cert. den.,* 379 U. S. 1001 (1965), it was pointed out that when evidence, similar to that upon which there was an original objection, is admitted later from another source, without objection, the original objection is waived. In the instant case there was evidence that appellant's psychiatrist, in his testimony, referred to evaluations of appellant by other medical staffs which revealed a diagnosis quite similar to that contained in the Perkins' report. We conclude appellant's objection to this particular question to have been waived. With respect to the question asked of Dr. Fitzpatrick in regard to any opinion of criminal responsibility reached by the Perkins staff conference, we find no merit in appellant's argument simply because there was no objection made at all. It is axiomatic that to preserve an issue for appeal some objection must be made or a party will be deemed to have waived an objection.

*See Sutton v. State,* 25 Md. App. 309, 334 A. 2d 126 (1975). We find no error by the trial court in its ruling on this issue.

*Judgment affirmed.*
*Costs to be paid by appellant.*