527 A.2d 803

**Charles Truman MILLWOOD**

v.

**STATE of Maryland**

**No. 1456, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

July 9, 1987.

Certiorari Denied Dec. 9, 1987.

Gerald A. Kroop (John D. Thompson and Kroop, Kurland & Rosenberg, on the brief), Baltimore, for appellant.

Norman L. Smith, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, M. Kenneth Long, Jr., State's Atty., for Washington County and Andrew G.W. Norman, Asst. State's Atty., for Washington County on the brief, both of Hagerstown), for appellee.

Argued before BLOOM and ROBERT M. BELL, JJ., and W. ALBERT MENCHINE, Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

BLOOM, Judge.

A jury in the Circuit Court for Washington County convicted appellant, Charles Truman Millwood, of possession of methamphetamines, a controlled dangerous substance, with intent to distribute; unlawfully bringing methamphetamines into Maryland; and unlawful transportation of a handgun, for which he received concurrent sentences of five years, twelve years and three years, respectively.

In this appeal from those judgments, appellant asserts error in the trial court's denial of his motion to suppress, as the fruits of an illegal search and seizure, the evidence (methamphetamines and weapons) used to convict him. Finding no error in the ruling on appellant's suppression motion, we will affirm the judgments.

### Facts

At 4:45 p.m. on 31 January 1986, the dispatcher at the Hagerstown Barracks of the Maryland State Police received a telephone call from an anonymous informant who stated that a purple ("like a lavender") 1965 Ford Thunderbird with Pennsylvania license plates was traveling south on Interstate 81 on a drug run from Pennsylvania into Maryland. It was alleged by the caller that the automobile contained a shipment of methamphetamines in the trunk or taped inside the grill. The informant further indicated that

the car would cross into Maryland "in an hour or two" and that the occupants of the vehicle were a white male, wearing an "Indiana Jones" style hat, and a white female.

The Maryland State Police alerted its counterpart in Pennsylvania to be on the lookout for the suspect vehicle. Some time later, Pennsylvania officers advised the Maryland State Police that an automobile matching the description provided by the informant was then traveling south on Interstate 81 about 12 miles north of Maryland. Maryland Troopers Twigg and Keckler established surveillance posts along Interstate 81 near the Pennsylvania-Maryland border.

At approximately 5:50 p.m. Trooper Twigg observed a purple or lavender mid-sixties Thunderbird with Pennsylvania tags cross over into Maryland. Contacting Trooper Keckler by radio, Twigg, driving a marked police cruiser, began to follow the Thunderbird. Shortly thereafter, Trooper Keckler, who was driving an unmarked car, caught up with Trooper Twigg and the suspect vehicle. The two officers continued to follow the Thunderbird, hoping to observe the driver commit a violation of a traffic law. The driver, however, obeyed the posted speed limit and otherwise operated his vehicle in a lawful manner, thus providing no opportunity for the police to stop him on the basis of his driving.

After confirming that the car was a purple or lavender mid-sixties Thunderbird with Pennsylvania license tags and two occupants, Trooper Twigg activated his emergency lights and motioned to the driver to pull the Thunderbird over. The operator, appellant, Charles Millwood, responded by driving off Interstate 81 into a gasoline service station just off the highway. Millwood, who was wearing a felt hat described by Trooper Keckler as being "Indiana Jones" style, stepped out of the Thunderbird and approached Trooper Twigg. Trooper Keckler ordered Millwood to place his hands on the police cruiser so that he could be frisked. After he had assumed the "spread eagle" position, Millwood was informed by Trooper Keckler that he had been stopped because the police

... had received an anonymous phone tip that the car he was driving was described, that there was a white female passenger alleged to be with him, and that there was to be, according to the caller, a quantity of methamphetamine in the car, either taped to the back of the grill or in the trunk.

The passenger of the car, a white female, got out of the vehicle and remained near its right side throughout the ensuing events.

Exactly what occurred after Millwood was frisked is disputed by the parties. According to Millwood, while he was being frisked Trooper Keckler grabbed the keys from the ignition of the Thunderbird and began to search the trunk. While rummaging through the trunk, the trooper said, "I guess I have your permission to search ..., ain't I?" and then threatened to "tear it all to damn pieces" if Millwood would not consent to the search. Millwood claimed he told the troopers to go ahead with the search because they were "very likely gonna do it anyway." Trooper Keckler's version of what occurred differed dramatically, not only as to the timing of the search but also with respect to his demeanor in dealing with Millwood.

As a result of the search, a large quantity of methamphetamines and two handguns were discovered. Millwood and his female passenger were then placed under arrest.

Millwood's motion to suppress the evidence obtained from the search of his automobile was denied on the alternative bases (1) that the police had probable cause to effect the search and (2) that Millwood had consented to the search.

## Appellant's Contentions

Millwood's assertion that the court erred in denying his motion to suppress the evidence recovered from the Thunderbird is based primarily upon his contention that the information provided by the anonymous informant was insufficient to constitute probable cause for the search of his vehicle. He also insists that his consent to the search was

coerced and, therefore, was involuntary. Furthermore, Millwood argues, even if he had consented to the search of his car, that consent and the resulting search were the products of an illegal stop and thus invalid as the "fruits of the poisoned tree," citing *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

We need not determine whether the police had probable cause to search the Thunderbird, nor need we consider the "poisoned tree" argument, because we find that Millwood voluntarily consented to the search after having been subjected to a valid investigatory stop.

## I *Investigatory Stop*

In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that a police officer, in appropriate circumstances, may approach, accost, and temporarily detain a person for the purpose of investigating possible criminal activity even though the officer lacks probable cause to effect an arrest. *Id.* at 22, 88 S.Ct. at 1880. As stated in *Adams v. Williams*, 407 U.S. 143, 145, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972):

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur. On the contrary *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response.

That "intermediate response" is the investigatory stop.

A valid investigatory stop under *Terry*, in its simplest terms, requires only that the officer, in light of his experience, reach the reasonable conclusion that some type of criminal activity is taking place or is about to take place. *United States v. Gomez*, 776 F.2d 542, 546 (5th Cir.1985). *See, e.g., Terry v. Ohio, supra*, 392 U.S. at 30, 88 S.Ct. at 1884; *Mosley v. State*, 45 Md.App. 88, 194–95, 411 A.2d 1081 (1980), *aff'd*, 289 Md. 571, 425 A.2d 1039 (1981). That conclusion must be based upon a "reasonable articulable suspicion" that a crime is being or is about to be committed.

*Terry v. Ohio, supra,* 392 U.S. at 21–22, 88 S.Ct. at 1880; *Gibbs v. State,* 18 Md.App. 230, 306 A.2d 587, *cert. denied,* 269 Md. 759 (1973). The officer may develop his reasonable suspicion as a result either of direct personal observation of questionable activity, as in *Mosley v. State, supra,* or confirmation of information received from an informant. *See e.g., Adams v. Williams, supra; United States v. Andrews,* 600 F.2d 563 (6th Cir.1979); *Johnson v. State,* 50 Md.App. 584, 439 A.2d 607 (1982).

Obviously, the degree of suspicion that reasonably may arise from a tip varies according to the facts and circumstances in each case. As the Supreme Court pointed out:

> Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability. One simple rule will not cover every situation. Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized. But in some situations— for example, when the victim of a street crime seeks immediate police aid and gives a description of his assailant, or when a credible informant warns of a specific impending crime—the subtleties of the hearsay rule should not thwart an appropriate police response.

*Adams v. Williams, supra,* 407 U.S. at 147, 92 S.Ct. at 1924. *Cf. United States v. White,* 648 F.2d 29, 41 (D.C.Cir.) ("not all tips are created equal"), *cert. denied,* 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233, 70 L.Ed.2d 235 (1981). In holding that the information received from an informant justified the police in stopping the driver of a car for questioning, the Court in *Adams* stressed that the informant was personally known by the officer and that he had given information in the past. Moreover, the Court noted that under the applicable law, had the tip proved incorrect, the informant would have been arrested for filing a false complaint. 407 U.S. at 146–47, 92 S.Ct. at 1923.

The Court in *Adams* explicitly distinguished the situation before it from that of an anonymous telephone tip, *id.* at

146, 92 S.Ct. at 1923, leaving open the question as to whether an investigatory (*Terry*) stop might be justified on the basis of a tip from an unknown informant. The Court had an opportunity to answer that question in a case in which the Supreme Court of Louisiana had upheld a conviction for possession of a handgun found as a result of a *Terry* stop based on an anonymous tip. Informed by an unknown caller that a black male wearing a yellow shirt and armed with a handgun was sitting in a particular bar, police officers went to the bar where they observed the defendant, who was the only person in sight matching that description. The officers accosted the defendant, frisked him, and discovered the handgun. *State v. Jernigan,* 377 So.2d 1222 (La.1979). The Supreme Court denied certiorari. Justice White, with Justices Brennan and Marshall concurring, dissented, saying:

We have not directly decided whether an anonymous tip may furnish reasonable suspicion for a stop and frisk. We have emphasized the specificity of the information provided, the independent corroboration by the police officer, and the danger to the public. *See, e.g., Adams, supra; Draper v. United States,* 358 U.S. 307 [79 S.Ct. 329, 3 L.Ed.2d 327] (1959). But in the decided cases, these factors were not the only indicia of reliability. The informers in *Adams* and *Draper* were known to have provided reliable information in the past. The same cannot be said of an anonymous tipster.

Arguably, the decision of the Louisiana Supreme Court, is inconsistent with our prior cases which require that reasonable suspicion be based on a sufficiently reliable informer's tip. I would grant certiorari for this reason and also because the reliability of an anonymous or unidentified tipster is an issue that has divided the federal courts of appeals. Compare *United States v. McLeroy,* 584 F.2d 746 (CA5 1978), and *United States v. Robinson,* 536 F.2d 1298 (CA9 1976) (no reasonable suspicion), with *United States v. Hernandez,* 486 F.2d 614 (CA7 1973) (per curiam) (reasonable suspicion), *cert. denied,*

415 U.S. 959 [94 S.Ct. 1488, 39 L.Ed.2d 574] (1974). *See also United States v. Gorin*, 564 F.2d 159 (CA4 1977), *cert. denied*, 434 U.S. 1080 [98 S.Ct. 1276, 55 L.Ed.2d 788] (1978), and *United States v. Unverzagt*, 424 F.2d 396 (CA8 1970) (identity of informer known but no proof of his reliability; reasonable suspicion found). The state courts are similarly divided.

*Jernigan v. Louisiana*, 446 U.S. 958, 100 S.Ct. 2930, 64 L.Ed.2d 816 (1980).

The courts remain divided. For example, in *Lunsford v. State*, 652 P.2d 1243 (Okl.Cr.1982), involving an anonymous tip that the defendant might have been involved in a recent burglary or, at least, might have information concerning the burglary, the Oklahoma Court of Criminal Appeals held that the tip did not carry with it sufficient reliability to justify a *Terry* stop. In *State v. Temple*, 65 Haw. 261, 650 P.2d 1358 (1982), the police received an anonymous telephone report that the caller had seen a handgun in the glove compartment of a black Chevrolet while the car was parked at a specified address. The caller identified the defendant as the owner of the car and furnished the tag number, which was registered to the defendant. It was held that the tip did not justify a *Terry* stop. Although the Oklahoma case can be distinguished from *Jernigan* in that the tip in *Lunsford* involved a prior crime and no details of the tip were verifiable, the Hawaii case is indistinguishable from *Jernigan*. Both involved tips as to crimes being committed, *i.e.*, illegal possession of a firearm; both could be verified by the police only as to details identifying the suspect. The Supreme Court of Louisiana stressed the fact that a handgun in a bar presented a threat of harm which added to the reasonableness of and justification for the officers' behavior, but it is difficult to see how a handgun in a bar presents a significantly greater potential for harm than a handgun being transported in the glove compartment of an automobile.

In *United States v. White, supra*, the Court of Appeals for the District of Columbia Circuit upheld an investigatory

stop based upon an anonymous tip that certain persons were then engaged in drug trafficking. The investigatory stop was justified because the tip was rich in details as to time and place, including a detailed description of one of the participants and their vehicles as well as their modus operandi and verified by the police, through surveillance, in all respects except for actual possession or sale of narcotics. The Court, by expressly distinguishing between anonymous tips verified as to criminal behavior and those verified only as to innocent details, impliedly recognized a third class: tips that cannot be verified as to any details (as in *Lunsford v. State, supra*, for example). Acknowledging that there was a division of authority, the Court in *White* joined those jurisdictions that approve investigatory stops on the basis of anonymous tips even if verification is limited to "innocent" details.

We believe the classification of verifiable information into "criminal" and "innocent" details ignores the real problem, which is one of reliability. When police act upon information received from someone outside their own organization, whether to make an arrest, search, seizure, or investigatory stop, the concern is with the degree of credibility that can be afforded the outside information. Under the *Aguilar-Spinelli* test,[1] a magistrate in issuing a warrant (for arrest or search and seizure) or a police officer in effecting a warrantless arrest, search or seizure could find probable cause in an informant's tip only if there was some basis for believing that the informant was reliable *and* that he had a reliable basis for his information. Predating *Aguilar* was *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), in which a federal narcotics agent was told by an informer, whose information the agent had always found to be accurate and reliable, that Draper, who was unknown to the agent but who was described in detail

---

1. *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

by the informant, was dealing in narcotics, had gone to Chicago to obtain a supply, and would return on a certain train on a certain day or the day after. The agent met the train, easily recognized Draper by the informer's description (even as to clothing), and arrested him without a warrant. The Court held that the arrest was lawful, the combination of a reliable informant and verification by observation of all details of the information except the actual possession of narcotics was sufficient probable cause.

The Supreme Court, in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), rejecting the rigid two-prong test of *Aguilar* and *Spinelli* and adopting a more flexible "totality of circumstances" test, held that an anonymous tip, which the police were able to verify as to various details, furnished probable cause for the issuance of an arrest warrant. There the tip detailed future activities of the suspects that were highly suspicious in nature. The informant being unknown, his credibility could not be vouched for; but the ability of the police to verify details of the tip as to the conduct of the suspects that was unusual and suspicious in nature gave some degree of credibility to the information and thus to the informant himself. Of particular significance was the fact that the verified information included details that would ordinarily be known only to someone familiar with the suspects and their plans and activities. Knowledge of such details gave rise to a reasonable inference that the informant had access to reliable information about the suspect's illegal activities. *Cf. Draper v. United States, supra.* The nature of the details furnished by the informant that the police were able to verify, involving suspicious behavior that the informant was able to predict in advance, furnished a reasonable basis to believe that the informant was credible and that he had a reliable source of information.

Unquestionably, the reasonable suspicion that will justify a *Terry* stop may be founded on some lesser degree of reliability than would be required for the probable cause

to support an arrest, search or seizure. *United States v. McBride*, 801 F.2d 1045, 1047 (8th Cir.1986). An anonymous tip may serve as a basis for a reasonable articulable suspicion if it is sufficiently detailed and corroborated that a reasonable person would regard it as reliable. We need not attempt to establish just how much or little detail and corroboration will suffice—whether corroboration merely of details as to identity of the suspect will, as in *State v. Jernigan, supra,* or will not, as in *State v. Temple, supra,* justify an investigatory stop. Whatever those limits may be, we are persuaded that an anonymous tip that a suspect is presently engaged in criminal activity will afford a sufficient basis for an investigatory stop if the tip includes details, confirmed by police observation, which strongly indicate that the informant is sufficiently well-acquainted with the individual identified in the tip to know he may be involved with criminal activity. *United States v. McBride, supra,* 801 F.2d at 1047; *United States v. Gomez, supra,* 776 F.2d at 547. That is the type of information which, if verified, tends to create a reasonable belief that the informant is credible and his information is reliable. *Illinois v. Gates, supra; Draper v. United States, supra.*

With that principle in mind, we turn now to an examination of the anonymous tip in the case *sub judice.* The caller informed the state police that methamphetamines were being transported in Pennsylvania along Interstate 81 by a white male wearing an "Indiana Jones" style hat and a white female, both occupying an automobile of a specific year, make, model and color with Pennsylvania tags. If that had been the extent of the tip given by the informant, it might well be questionable whether confirmation of that information would have justified even an investigatory stop. A mere description of the Thunderbird and its occupants could have been provided by any mischief maker who merely happened to observe the distinctive automobile as it traveled southward along Interstate 81. What sets this anonymous caller apart from the public at large, and what provides a reasonable basis for suspecting that his allega-

tion of criminal activity may be true, is that he correctly informed the police that the Thunderbird would continue along Interstate 81 and cross over into Maryland in one to two hours. Considering that the automobile was carrying Pennsylvania tags, it is highly unlikely that one not intimately familiar with the car and its occupants—a mere casual observer—could have foretold the entry of the Thunderbird into Maryland one to two hours beforehand. Confirmation of that prediction, along with the later confirmation of substantially all of the other information provided by the informant, provided an articulable reasonable basis to suspect that the informant's tip was true and thus to stop the Thunderbird and question its occupants.[2]

## II *Consent*

■ Appellant maintains that his consent to the search of the automobile was the result of coercion, thus invalid. The determination of whether the consent was voluntary, in the constitutional sense of the term, is a factual question to be ascertained from the totality of the surrounding circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *Humphrey v. State*, 39 Md.App. 484, 489, 386 A.2d 1238, *cert. denied*, 283 Md. 733 (1978). "[A]ccount must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Schneckloth, supra*, 412 U.S. at 229, 93 S.Ct. at 2049. When confronted with allegations of infringement of constitutional rights, we are required to examine the entire record of the suppression hearing and to make an independent reflective constitutional judgment on the facts.[3] *In re: Anthony F.*, 293 Md. 146,

---

2. Apparently, the state police were unable to verify the sex and race of the Thunderbird's occupants until after they stopped the vehicle. We find that point to be of no significance in light of the extent of the informant's information that was confirmed prior the stop.

3. In *Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985), there is some suggestion that the independent, reflective constitutional judgment of the facts, which is required with respect to

152, 442 A.2d 975 (1982); *Logue v. State,* 282 Md. 625, 630, 386 A.2d 780 (1978); *Whitman v. State,* 25 Md.App. 428, 435, 336 A.2d 515 (1975). As stated by Judge Moylan in a case involving a constitutional review of the voluntariness of a confession:

> What we mean, therefore, when we say that we have the obligation to make an independent, reflective constitutional judgment on the facts whenever a claim of a constitutionally-protected right is involved is that, although we give great weight to the findings of the hearing judge as to specific, first-level facts (such as the time that an interrogation began, whether a meal was or was not served, whether a telephone call was requested, etc.) we must make our own independent judgment as to what to make of those facts; we must, in making that independent judgment, resolve for ourselves the ultimate, second-level fact—the existence or non-existence of voluntariness.

*Walker v. State,* 12 Md.App. 684, 695, 280 A.2d 260 (1971).

As a first-level finding of fact, the court below rejected Millwood's version of the events surrounding the search of the automobile. The court accepted Trooper Keckler's testimony as to what was said and done after the police stopped Millwood's car. According to Trooper Keckler, he told Millwood he believed he had the right to search the Thunderbird but would like Millwood's permission to search in any event, to which Millwood replied, "Go ahead, we have nothing to hide." Having obtained Millwood's permission, the trooper took the keys from the ignition of the Thunderbird, and Millwood identified the trunk key. Thereafter, the trooper opened the trunk and discovered a large quantity of methamphetamines and a handgun.[4]

---

Fifth Amendment voluntariness of a confession, may not be required with respect to claims of infringements on other constitutional rights.

**4.** A second handgun was later found in the passenger compartment of the vehicle.

 Inasmuch as the court's findings of first-level fact are not inherently improbable, *Borgen v. State*, 58 Md.App. 61, 79, 472 A.2d 114 (1984), and are based upon its assessment of the credibility of the witnesses, we leave those findings undisturbed. Md. Rule 1086. The question becomes whether those facts, and the reasonable inferences arising therefrom, demonstrate voluntary consent by the preponderance of the evidence. We believe they do.

Appellant argues that the court below failed to consider his level of intelligence and the psychological forces that were exerted upon him in obtaining his consent. As to Millwood's level of intelligence, the court, which had an opportunity at the suppression hearing not only to observe Millwood but also to hear him testify, did not note in its memorandum opinion that Millwood had demonstrated any mental deficiency. In the absence of any proffer by Millwood concerning his mental capabilities, we presume that he, being a mature adult, possessed normal mental faculties. There is certainly nothing in the record to suggest that there was any intellectual deficiency that might indicate an unusual susceptibility to coercion.

We are also unpersuaded that Millwood's consent was the result of oppressive psychological forces. This case is far different from that of *Whitman v. State*, 25 Md.App. 428, 336 A.2d 515 (1975), upon which Millwood relies. In that case, an informant alerted the police that Whitman was transporting untaxed cigarettes into the state. The police stopped Whitman's truck, placed him under arrest and then asked his permission to search his vehicle. Whitman refused to consent; thereafter he and the vehicle were separately taken to the State Roads Barn in Somerset County. There, the police again requested Whitman's consent to a search. Whitman continued to deny his permission until the police told him that they were going to open the trunk with or without his consent. *Id.* at 430–31, 336 A.2d 515.

We held in *Whitman* that the consent was rendered as a result of coercion. In reaching that conclusion, we identi-

fied eight occurrences we considered to be of "enormous psychological effect and of compelling significance":

1. There was no probable cause for appellant's arrest as shown by the evidence and as conceded by the State;

2. He was in custody for at least one and a half hours in the presence of three uniformed State troopers and a prosecuting attorney;

3. He was detained in a strange environment, a room located in the State Roads Barn to which he and his truck had been separately transported;

4. He was subjected to questioning by at least two uniformed State troopers and by the prosecuting attorney;

5. In his presence, telephone calls were made after two o'clock in the morning to a local District Court judge and the circumstances were such as reasonably to induce appellant's belief that the judge was enroute to issue a search warrant;

6. The search warrant papers were being typed in his presence after refusals on his part of several requests to consent to the search of his truck and appellant was told by the officer at the typewriter that less time would be consumed if he consented to the search;

7. The State police had previously "advised him what the law was" and had stated unequivocally that they could legally conduct the search with or without appellant's consent;

8. Appellant's ultimate oral and written consents were given after about one and a half hours in custody, at approximately 2:30 a.m., as he expressed it, and as the trial judge found, to save time. "... if I was already under arrest anyway, they are going to open it anyway so save a little time."

*Id.* at 454–55, 336 A.2d 515. None of those facts and circumstances, however, are present in the case *sub judice.* Millwood was not placed under arrest prior to consenting to

the search of the Thunderbird. Neither was he detained in the early morning hours in a strange environment before rendering his consent. He was not questioned by a prosecutor, nor did he refuse his consent to the search and then find himself subject to pressure to reconsider that refusal. Trooper Keckler did not "unequivocally" state that he legally had a right to search the Thunderbird with or without Millwood's consent; the trooper merely expressed what he described to Millwood as being his "belief" that he could search the vehicle in any event.

Millwood was stopped at a gasoline station in the early evening. The trooper who stopped Millwood informed him why he was stopped and patted him down for weapons. Immediately thereafter and in full public view he was requested to permit a search of his vehicle. Rather than objecting, he stated, "Go ahead, we have nothing to hide," and then voluntarily identified the key which unlocked the trunk. He stood by as the trooper searched the Thunderbird. The trooper did not place him under arrest until after contraband was discovered in the car. Such a series of events hardly smacks of the level of coercion present in *Whitman. Cf. Smith v. State*, 62 Md.App. 627, 490 A.2d 1307, *cert. denied*, 304 Md. 96, 497 A.2d 819 (1985); *Borgen v. State, supra; Humphrey v. State, supra*. Accordingly, our independent review of the totality of the circumstances surrounding Millwood's consent leads us to conclude that that consent was voluntarily given.

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANT.

ROBERT M. BELL, Judge, dissenting.

Although not explicitly stated, I read the majority opinion as rejecting the State's contention that probable cause existed for the arrest of appellant and his companion as well as for search of appellant's vehicle. To the extent that my reading is correct, I agree with the majority on this point. On the other hand, I disagree with its conclusion

that the anonymous tip in this case, under the circumstances, provided a sufficient basis for a *"Terry"* stop.[1]

The majority acknowledges that the authorities are in conflict as to whether an anonymous tip, the details of which have been verified by the police, may serve as a predicate for a *Terry* stop. Compare *United States v. White*, 648 F.2d 29 (D.C.Cir.) *cert. denied*, 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233, 70 L.Ed.2d 235 (1981) and *State v. Jernigan*, 377 So.2d 1222 (La.1979), *cert. denied*, 446 U.S. 958, 100 S.Ct. 2930, 64 L.Ed.2d 816 (1980)[2] with *Lunsford v. State*, 652 P.2d 1243 (Okla.Cr.1982) and *State v. Temple*, 65 Haw. 261, 650 P.2d 1358 (1982). It then proceeds to formulate a general rule: "An anonymous tip may serve as a basis for a reasonable articulable suspicion if it is sufficiently detailed and corroborated that a reasonable person would regard it as reliable", which it explicates as follows:

> ... An anonymous tip that a suspect is presently engaged in criminal activity would afford a sufficient basis for an investigative stop if the tip includes details, confirmed by police observation, which strongly indicate that the informant is sufficiently well acquainted with the individual identified in the tip to know that he may be involved with criminal activity.

Op. at 93. Building upon that principle, the majority asserts:

> The caller informed the State Police that methamphetamines were being transported in Pennsylvania along Interstate 81 by a white male wearing an "Indiana Jones"

---

1. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) permits an officer, based upon a "reasonable articulable suspicion" that a crime is being or is about to be committed, to conduct an investigative stop of a person suspected of engaging in criminal conduct. *Id.*, 392 U.S. at 21–22, 88 S.Ct. at 1880.

2. In dissent, Justices White, Brennan and Marshall would have granted certiorari "because the reliability of an anonymous or unidentified tipster is an issue that has divided the federal courts of appeal" and because the decision in *Jernigan* was "arguably" inconsistent with the Court's prior cases. *Id.*, 446 U.S. at 959–60, 100 S.Ct. at 2931.

style hat and a white female both occupying an automobile of a specific make, model and color with Pennsylvania tags. If that had been the extent of the tip given by the informant, it might well be questionable whether confirmation of that information would have justified even an investigatory stop. A mere description of the Thunderbird and its occupants could have been provided by any mischief maker who merely happened to observe the distinctive automobile as it travelled southward along Interstate 81. What sets this anonymous caller apart from the public at large, and what provides a reasonable basis for suspecting that his allegation of criminal activity may be true, is that he correctly informed the police that the Thunderbird would continue along Interstate 81 and cross over into Maryland in one to two hours. Considering that the automobile was carrying Pennsylvania tags, it is highly unlikely that one not intimately familiar with the car and its occupants—the mere casual observer—could have foretold the entry of the Thunderbird into Maryland one to two hours beforehand. Confirmation of that prediction, along with the later confirmation of substantially all of the other information provided by the informant, provided an articulable reasonable basis to suspect that the informant's tip was true and thus to stop the Thunderbird and question its occupants. (footnote omitted)

Op. at 92–94. It relies upon *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) and *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959) for the proposition that the information provided by the anonymous tip in this case, when verified, tended to create a reasonable belief that the informant was credible and his information was reliable.

Before addressing the majority's rationale for upholding the stop in this case, I think it appropriate to point out that the stop was unjustified for the simple reason that it was effected prior to police verification of the details of the tip. When appellant's car was stopped, the police did not know, as they candidly admitted, the sex of the occupants, the

race of the occupants, the color of the car, or whether the driver possessed an "Indiana Jones" type hat. All they knew was that the car was a distinctive, mid-sixties Thunderbird. Verification of most of the details of the tip thus occurred after, not before, the stop. This alone renders the stop illegal.

In any event, neither *Gates* nor *Draper* supports the proposition for which they are cited by the majority. In *Draper*, the only gap in the informant's tip was the informant's basis of knowledge. The informant was a person known to the narcotics agent and the information he had provided in the past had always been found by the agent to be accurate and reliable. It was on the basis of the proven reliability of the informant and the verification of the details of his tip that the *Draper* Court determined that the basis of the informant's knowledge was also reliable and credible. In *Gates*, the tipster predicted that the suspects would engage in certain suspicious activities. Police verification that the suspects acted as the tipster said they would was a sufficient basis, the Court held, on which to conclude that both the tipster and the information he provided was reliable.

The tip in this case may not be credited either upon the *Draper* rationale or upon the *Gates* rationale. The informant was anonymous. Thus, he was not known to the police who acted on his tip, and, as far as is known, he had provided no information, reliable or otherwise, to the police in the past. Moreover, there is absolutely nothing suspicious, or even unusual, about a distinctive automobile with Pennsylvania license tags, occupied by a man and a woman proceeding southbound on I–81 from Pennsylvania into Maryland. Since that is essentially the information provided, it is patent that the tip was not of suspicious or unusual activities. Verification of such information tells us nothing whatsoever about the reliability of the tipster, not to mention the reliability and credibility of the conclusion he wishes the recipient of the information to draw. To the extent that verification of that information even warrants suspicion it certainly does not warrant reasonable suspicion. The majority agrees, it appears, to this point.

That the tipster reasonably accurately predicts the approximate time that the Thunderbird will arrive in Maryland, does not justify a different conclusion. Any run-of-the-mill mischief maker could make a lucky guess that the car would proceed down I–81 and into Maryland and, depending upon its location when observed in Pennsylvania, its estimated time of arrival. (It is relevant to note, in this regard, that the tipster provided himself an hour's leeway.) If he guesses wrong, there is no harm done—no one is stopped and he certainly is not at risk. Even assuming, on the other hand, that the anonymous tipster knew appellant, the only thing that information concerning arrival time in Maryland proves or reasonably suggests is that the tipster also knew appellant's itinerary. Again, it provides precious little, if any, insight into the tipster's reliability or the reliability of his information. If a *Terry* stop is justified on the basis of information of this kind, it is difficult to imagine an anonymous tip that would not justify such a stop. Any statement which fixes the location of the suspect would qualify because it would be self-verifying—if the tipster says the suspect will be at point A and he is at point A, the verification of that fact, under the majority view, would provide a reasonable basis for suspecting that the tipster's information is accurate. Because verification of the innocent and mundane details of a tip does not provide a basis for credibility of either the tipster or his information, I find the rule adopted by the majority to be merely a rationalization, under which any anonymous tip would provide the basis for a *Terry* stop.[3] I, for my part, find *State v. Temple, supra,* persuasive, I would hold that, in the case *sub judice,* the tip was an insufficient basis on which to conduct a *Terry* stop.

While I recognize that the trial court found as a fact that appellant's version of the events following the stop were less credible than that offered by the State, I nevertheless

---

**3.** A standard requiring verification of only innocent details is susceptible to "cheating", i.e. manufacturing anonymous tipsters.

find it difficult to accept the conclusion, concerning the voluntariness of appellant's consent to the search of his car, drawn both by the trial judge and the majority. Even in the State's version, Trooper Keckler told appellant that he "believed" that he could search appellant's car without appellant's consent. The majority says that that statement is different from appellant's version, in which the trooper stated "unequivocally" a right to search the Thunderbird with or without appellant's consent. Considering the circumstances in which the statement was made, rather than focusing exclusively upon the words used, the distinction escapes me; the statements are, in my view, indistinguishable. That being the case, and again considering the circumstances under which the stop and search occurred, I believe that the events smack of coercion. I agree that they do not reach the level of coercion present in *Whitman v. State,* 25 Md.App. 428, 336 A.2d 515 (1975), but then that is not the issue. *Whitman* is but one case in which, on the facts and circumstances therein existing, coercion was found. Different facts, even facts less egregious than those in *Whitman,* also may justify a finding of coercion. In my view, the circumstances here suggest that the trooper's statement of his belief that he could search the car whether appellant consented or not, resulted in appellant's acquiescence to a claim of lawful authority.