571 A.2d 887

**Gilbert Hood RICKS**

v.

**STATE of Maryland.**

**No. 1187, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

April 3, 1990.

Alan L. Cohen (Paul Michael Polansky, P.A. on the brief) Baltimore, for appellant.

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Davis R. Ruark, State's Atty. for Wicomico County, Salisbury, on the brief), for appellee.

Argued before GARRITY, ALPERT and KARWACKI, JJ.

GARRITY, Judge.

The appellant, Gilbert Hood Ricks, was convicted in the Circuit Court for Wicomico County (Simpson, J.) of possession and possession with intent to distribute cocaine, possession of marijuana, and possession of drug paraphernalia with intent to use it in conjunction with a controlled dangerous substance. Prior to trial, the appellant moved to suppress evidence which he contended had been illegally seized from him at the time of his arrest. After an evidentiary hearing, that motion was denied. The case then proceeded on an agreed statement of facts. On appeal, the appellant contends that the trial court erred in denying his motion to suppress.

### Factual Background

Trooper First Class Steven L. Aaron of the Maryland State Police Narcotics Division testified that during the week of October 10, 1988, he received a tip in the form of an anonymous call. The caller stated that an individual named Gilbert Ricks would be arriving in Salisbury, Maryland, from Baltimore on a Trailways bus on Friday, October 14, 1988. The caller advised that Ricks had previously come to the Salisbury area on Fridays on a Trailways bus, arriving between 6:00 and 6:30 p.m., and that each time he carried a brown to maroon colored soft, fold-over luggage bag containing cocaine. According to the caller, Ricks would then sell the cocaine in the Salisbury area over the course of the weekend, residing with an unidentified Salisbury couple at their home. The caller further described Ricks as a black male, approximately five foot, seven inches tall, weighing approximately 160 pounds, and sporting a close-cut graying haircut and beard.

As a result of receiving this information, Officer Aaron ran a criminal check on Ricks and found that there was an individual named Gilbert Ricks from Baltimore who matched the tipster's description of Ricks, and that Ricks had prior CDS and robbery convictions. On the afternoon of October 14, 1988, Officer Aaron and members of the

Wicomico County Narcotics Task Force went to the Salisbury Trailways bus terminal and confirmed that a bus would be arriving from Baltimore at 6:05 p.m. The officers then established a surveillance operation in the vicinity of the terminal.[1] At approximately 6:10 p.m. Officer Steven W. Bacon of the Maryland State Police, one of the surveillance units in the area, advised Officer Aaron that a Trailways bus was approaching the area from off of Route 50, that it had stopped near an Arby's Restaurant, and that a man matching the description of Ricks had exited the bus carrying a fold-over luggage bag.

Officer Bacon then stopped the appellant and identified himself as a police officer. Bacon asked the appellant for identification, and the appellant produced a Maryland driver's license bearing the name Gilbert Hood Ricks. Bacon then phoned Trooper Aaron, advising him of the appellant's name, to which Aaron responded, "[t]hat's him." Bacon then performed a protective "pat down" search on Ricks, and engaged in a conversation with him while waiting for Trooper Aaron, who arrived on the scene approximately one and one-half minutes later.[2]

After Aaron arrived, accompanied by two other officers, Ricks was advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The appellant was told of the reason he had been stopped, and was asked for consent to search his person and his bag. When the appellant refused, he was told by the officers that if he did not consent they could bring in their assistant,

---

**1.** Trooper Aaron testified: "We had subjects inside the bus station, on the parking lot of the bus station, and on patrol in the vicinity that the bus would come in on ... We knew the route that the bus normally travels is on Route 50, turns down Ward Street, and then goes up Main Street to the bus station."

**2.** Sergeant Bacon and the appellant were acquaintances, as the appellant had been a trustee at the Berlin, Maryland, barrack where Bacon had been previously assigned. Bacon testified as to the appellant's demeanor during this conversation: "He appeared somewhat nervous. Just generally nervous. He wasn't trembling or nothing, and [his] responses to the questions were like ... [he] had a lot on his mind."

"Dusty," the canine narcotics dog, to sniff for CDS in the bag. When the appellant again refused to consent to a search, Dusty was brought to the scene and the appellant's bag was placed on the ground. Dusty sniffed the luggage and scratched at one end of it, the means by which the dog signaled that it detected the presence of illegal drugs. The appellant's bag was then searched. The search revealed approximately 8.4 grams of cocaine, 2.3 grams of marijuana, and a variety of distribution paraphernalia, all found in the part of the bag that Dusty had scratched. The appellant was then formally placed under arrest.[3]

The appellant moved to suppress the CDS found in his bag, arguing that the police lacked probable cause to either detain him or search the contents of his luggage. The circuit court disagreed, stating:

THE COURT: In this case, there was a call from an anonymous caller giving a detailed description of somebody who was going to arrive at a specific time, carrying a specific type bag in which it was stated that there were controlled dangerous substances. This was a prediction, a very detailed prediction of future activity. The police observed when this was supposed to have occurred, and what the description was, and the prediction was, the prophecy was fulfilled. A person fitting that exact description, carrying that same bag did arrive. I believe certainly they were justified in stopping. They asked for the search, permission to search the bag.

According to the evidence, that was denied. The Defendant acted nervous at that point. Certainly, as set forth in *Grant v. State*, 55 Md.App. 1 [461 A.2d 524 (1983)], it would have been sheer folly, as stated in that case to allow the Defendant to leave with his bag at that point in time.

---

**3.** Officer Bacon testified as follows: "At the point that the dog alerted on that bag, if [appellant] had attempted to leave, I would have placed him under arrest. I had made no effort to do that, and he wasn't placed under arrest until the drugs were found in the bag."

A dog was called. I think there was probable cause to detain the Defendant for the limited purpose of having the dog come. I believe there is sufficient evidence that the dog did have training. He had over a hundred finds of cocaine. He never had a false. I believe that once the dog scratched the bag indicating there was narcotics in there, that there was probable cause for the arrest ...

Accordingly, the court denied the appellant's motion.

## Discussion

■ The appellant first contends that the State lacked probable cause to stop him initially for investigatory purposes under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and later arrest him. In *Millwood v. State*, 72 Md.App. 82, 527 A.2d 803 (1987), Judge Bloom observed on our behalf:

Unquestionably, the reasonable suspicion that will justify a *Terry* stop may be founded on some lesser degree of reliability than would be required for the probable cause to support an arrest, search or seizure. An anonymous tip may serve as a basis for a reasonable articulable suspicion if it is sufficiently detailed and corroborated that a reasonable person would regard it as reliable.... we are persuaded that an anonymous tip that a suspect is presently engaged in criminal activity will afford a sufficient basis for an investigatory stop if the tip includes details, confirmed by police observation, which strongly indicate that the informant is sufficiently well-acquainted with the individual identified in the tip to know he may be involved with criminal activity. That is the type of information which, if verified, tends to create a reasonable belief that the informant is credible and his information is reliable.

*Id.* at 92–93, 527 A.2d 803 (citations omitted). Clearly, the facts communicated to the police by the anonymous tipster were sufficiently detailed and later corroborated to indicate to the police that the informant knew the appellant well enough to know that he might be engaged in criminal

activity. The police were acting on information that included a very detailed description of the appellant, when and how he would arrive in Salisbury, and the means by which he allegedly would transport CDS. The appellant's identity was then corroborated as well as his prior criminal record involving controlled dangerous substances. The police additionally had a positive signal from their narcotics dog that the appellant's luggage contained a controlled substance.[4]

The facts before us are strikingly similar to those before the Supreme Court in *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). In *Draper*, a federal narcotics agent received information from an informant that Draper was selling narcotics in Denver. Four days later the informant told the agent that Draper had gone to Chicago the day before by train, that he was going to bring back three ounces of heroin, and that "he would return to Denver either on the morning of the 8th of September or the morning of the 9th of September also by train." The informant further gave to the agent a detailed description of Draper, including the clothing he was wearing, and related that he would be carrying a "tan zipper bag" and that he characteristically "walked real fast." The agent, together with a Denver police officer, went to the train station on the morning of September 9th and watched all incoming trains from Chicago. They observed a person having the physical attributes and wearing the clothing described by the informant leave an incoming Chicago train and walk fast. Draper was carrying a tan zipper bag. The officers apprehended Draper, searched his person, and found two packets of heroin clutched in his left hand in his raincoat pocket. In upholding the detention and arrest of Draper, Justice Whittaker, writing for the majority, stated:

---

**4.** Deputy Melvin Wilkinson of the Wicomico County Sheriff's Department testified as to the reliability of Dusty, the narcotics' canine. He stated that, to his knowledge, the dog had alerted to the presence of both crack cocaine and powdered cocaine over one hundred times or more without a false identification.

Nor can we agree with petitioner's second contention that Marsh's [the narcotics officer] information was insufficient to show probable cause and reasonable grounds to believe that petitioner had violated or was violating the narcotic laws and to justify his arrest without a warrant. The information given to narcotic agent Marsh by "special employee" Hereford [the informant] may have been hearsay to Marsh, but coming from one employed for that purpose and whose information had always been found accurate and reliable, it is clear that Marsh would have been derelict in his duties had he not pursued it. And when, in pursuing that information, he saw a man, having the exact physical attributes and wearing the precise clothing and carrying the tan zipper bag that Hereford had described, alight from one of the very trains from the very place stated by Hereford and start to walk at a "fast" pace toward the station exit, Marsh had personally verified every facet of the information given him by Hereford except whether petitioner had accomplished his mission and had the three ounces of heroin on his person or in his bag. And surely, with every other bit of Hereford's information being thus personally verified, Marsh had "reasonable grounds" to believe that the remaining unverified bit of Hereford's information—that Draper would have the heroin with him—was likewise true.[5]

358 U.S. at 312–13, 79 S.Ct. at 333. In light of the detail and accuracy of the tip received by Trooper Aaron, as well as Dusty's positive signal, we hold that the stop and subsequent arrest of appellant Ricks was supported by the requisite probable cause. *See Florida v. Royer*, 460 U.S. 491,

---

**5.** The Court in *Draper* further held that the heroin seized from Draper's person was done so pursuant to a valid search incident to his arrest. We do not view that holding as dispositive of this appeal, however, as the CDS that was the subject of appellant Rick's motion was discovered not on his person but in a bag that had been separated from him.

505–506, 103 S.Ct. 1319, 1328–29, 75 L.Ed.2d 229 (1983); *Grant v. State*, 55 Md.App. 1, 28–29, 461 A.2d 524 (1983).

The appellant argues finally that, even assuming probable cause existed to stop or arrest him, the warrantless search of his luggage was unreasonable because it was unsupported by exigent circumstances. In support of his argument, the appellant relies on the cases of *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), and *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979). Those cases each involved warrantless searches of containers (a 200 pound footlocker in *Chadwick* and a small suitcase in *Sanders* ) seized from the trunk of an automobile, and in each the Supreme Court held that the seized containers could not be searched pursuant to the so-called "automobile exception" to the warrant requirement created by *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Justice Powell, writing for the majority in *Sanders*, explained:

A closed suitcase in the trunk of an automobile may be as mobile as the vehicle in which it rides. But as we noted in *Chadwick*, the exigency of mobility must be assessed at the point immediately before the search—after the police have seized the object to be searched and have it securely within their control. Once police have seized a suitcase, as they did here, the extent of its mobility is in no way affected by the place from which it was taken. Accordingly, as a general rule there is no greater need for warrantless searches of luggage taken from automobiles than of luggage taken from other places.

Similarly, a suitcase taken from an automobile stopped on the highway is not necessarily attended by any lesser expectation of privacy than is associated with luggage taken from other locations.... Accordingly, the reasons for not requiring a warrant for the search of an automobile do not apply to searches of personal luggage taken by police from automobiles. We therefore find no justification for the extension of *Carroll* and its progeny to the warrantless search of one's personal luggage merely

because it was located in an automobile lawfully stopped by the police.

*Arkansas v. Sanders*, 442 U.S. at 763–65, 99 S.Ct. at 2592–94.

Our reply to the appellant's reliance on *Chadwick* and *Sanders*, however, is that the search *sub judice* was not conducted in furtherance of or outside the scope of an automobile search. Rather, it was clearly a search incident to a valid arrest, an exception to the warrant requirement that was not relevant to either *Chadwick* or *Sanders*. *New York v. Belton*, 453 U.S. 454, 461–62, 101 S.Ct. 2860, 2865, 69 L.Ed.2d 768, 776 (1981).[6]

■ The permissible scope of a search incident to an arrest was outlined in *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969):

When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control"

---

6. The record indicates that the appellant's bag was searched immediately upon Dusty's positive signal, but before the appellant was officially placed under arrest. Although normally an arrest will precede a search, "there is no rigid requirement that the arrest literally precede its search incident. It is enough that they are essentially contemporaneous," as noted on our behalf by Judge Moylan in *Anderson v. State*, 78 Md.App. 471, 481, 553 A.2d 1296 (1989).

—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

395 U.S. at 762–63, 89 S.Ct. at 2039–40. We note that the area deemed to be within an arrestee's reach, lunge or grasp is broad, and is not necessarily made any narrower by apparent obstacles inhibiting an arrestee's movement. In *Foster v. State*, 297 Md. 191, 464 A.2d 986 (1983), for example, the police searched inside the drawer of a nightstand which was within two feet of the handcuffed arrestee. The court allowed the search as reasonable and incident to an arrest, agreeing with courts in other jurisdictions that "even after an arrestee has been handcuffed there is a continuing potential for harm." *Id.* at 219, 464 A.2d 986. The Court elaborated: "The fact that the accused was handcuffed necessarily restricted her freedom of movement and, consequently, the area within her reach, but did not necessarily eliminate the possibility of her gaining access to the contents of the nightstand's partially open top drawer. . . . particularly if she had been able to break free of restraint." *Id.* at 220, 464 A.2d 986.

In *Lee and Hall v. State*, 311 Md. 642, 537 A.2d 235 (1988), the Court of Appeals extended considerably the permissible scope of a search incident to arrest. In *Lee and Hall*, the arrestees were lying face down on a basketball court, surrounded by five Special Assignment Team police officers, "at least two of whom were armed with shotguns," *id.* at 651, 537 A.2d 235, when a sixth officer confiscated and searched a gym bag hanging on a fence "probably a couple of feet away," *id.*, from the arrestees. The court upheld the search as incident to an arrest, noting that "it is clear that the area of immediate control under *Chimel* is determined by the potentiality for harm and not by actual, physical control by the arrestee at the time the search is conducted." *Id.*, 311 at 670, 537 A.2d 235.

In *Lee and Hall, supra,* the Court of Appeals further found *New York v. Belton, supra,* demonstrative that *"Chimel's* concept of an area of control is quite flexible." In

*Belton,* a police officer searched the pocket of a jacket which was in the passenger compartment of an automobile, while the arrestee-passengers were standing on the highway at an unspecified distance from the car where they had been separately positioned by the arresting officer before he entered the car. The Supreme Court upheld the search, viewing the entire passenger compartment of an automobile as an area into which an arrestee might reach, and holding generally that "the police may also examine the contents of any containers found within the passenger's compartment, for if the passenger compartment is within reach of the arrestee, so also will containers in it be within his reach ..." *Id.* at 670, 537 A.2d 235.[7]

■ At the time the appellant's bag was searched, he was in the company of five police officers. He had not been restrained in any manner, however, and remained in the vicinity of the bag lying on the ground nearby. With both *Foster* and *Lee and Hall* as precedent, we have no difficulty holding that at the time appellant Ricks' luggage was searched, it remained within the area of his immediate control, i.e., the area from within which he might have gained possession of a weapon or destructible evidence. Accordingly, as probable cause existed to stop and later arrest the appellant, and as the search of his bag was valid as incident to his arrest, we hold that the circuit court did not err in denying his motion to suppress.

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.

---

7.   The clear import of *Belton* is that if a container ... falls within the *Chimel* perimeter and is simply coincidentally encountered in the course of an otherwise constitutional search incident to lawful arrest, the container enjoys no special immunity under *Chadwick* ... *Chadwick,* simply has no relevance when the container is found within the *Chimel* perimeter and warrantlessly searched as an incident of lawful arrest.
Gilbert and Moylan, *Maryland Criminal Law: Practice and Procedure,* 355 (1983).